Betty Ann HAUGEBERG, Plaintiff and Appellee,

v.

Arvid Herman HAUGEBERG, Defendant and Appellant.

Civ. No. 9358.

Supreme Court of North Dakota.

Oct. 12, 1977.

Bjella & Jestrab, Williston, and Herman F. Gierke, III, Watford City, for plaintiff and appellee; argued by Mr. Gierke.

Ella Van Berkom, Minot, for defendant and appellant.

ERICKSTAD, Chief Justice.

In this case Arvid H. Haugeberg, the defendant in an action for divorce instituted by Betty A. Haugeberg, appealed from those parts of the judgment delineating the property division, awarding child support and alimony, and ordering the defendant to pay $1,750 for the plaintiff's attorney fees.

The parties were married in Minot, North Dakota, on February 12, 1956. There have been four children born of this marriage, namely: Thomas Lynn Haugeberg, born August 30, 1956; Carrie Lou Haugeberg, born July 14, 1958; Jeffrey Lee Haugeberg, born June 23, 1960; and Mitchael Lory Haugeberg, born September 23, 1961.

Arvid, at the time of the marriage in 1956, was attending Minot State College. He was graduated from that college with a Bachelor of Science degree three years after their marriage. During this time, he worked 41 hours per week for MDU. After graduation he was employed by International Harvester basically as a salesman. He was a traveling salesman for International Harvester out of Minot and Stanley until 1963 when he went to work for O.K. Implement Company at Watford City, North Dakota. At the time that he started to work for O.K. Implement in 1963, he bought 453 shares of stock in O.K. Implement which represented about 25% of the outstanding stock of the corporation. He gave a $25,000 promissory note for the stock. This note was gradually paid off out of bonuses he earned with the company with the final payment being made in 1974. He sold all of the stock back to the corporation in January 1976, about three months before the divorce action was commenced. In return for his stock, Arvid received a $25,000 promissory note due in January 1979 together with interest accrued at 8% per annum. While he owned stock, Arvid was on the board of directors and held the office of vice president, although his primary duty was that of a salesman. He is currently working for O.K. Implement as a salesman. Arvid has had a problem with high blood pressure and was in intensive care units three times in 1974 for a heart condition. He also has had an alcohol problem for which he has received treatment at Heartview in Mandan and at A.T.U. at St. Josephs Hospital in Minot. He now believes he has this problem under control.

Betty is 40 years old and has a high school education. She was employed outside of their home while Arvid was going to school, taking time off, for short periods, for the birth of their children. She did not work outside the home from 1959 until they moved to Watford City in 1963. Since moving to Watford City, she has worked as a babysitter and as a part time bookkeeper and she is currently employed as a bookkeeper for two firms in the city.

The action for divorce was commenced by Betty by service of the summons and complaint on Arvid on April 19, 1976. Betty

also made a motion for an order to show cause why the court should not grant a temporary restraining order requiring her husband to leave the family home and providing for child custody, support, and visitation. A restraining order was entered pursuant to a stipulation of the parties in May of 1976. The action was tried in the Fifth Judicial District at Watford City on August 25, 1976. Under the judgment dated February 1, 1977:

Betty was awarded an absolute decree of divorce on the grounds of irreconcilable differences.

Betty was awarded custody of the two minor children subject to reasonable visitation rights on behalf of Arvid.

Arvid was required to pay $150 per month for each minor child until the particular child reached the age of 18 or ceased to be Betty's dependent.

Arvid was ordered to pay $300 a month as alimony until January, 1979, for a total amount of $7,800.

Betty was to receive the parties' home with an equity of $29,197.85.

Betty was to receive the proceeds of the sale of stock, i.e. the $25,000 note along with accrued interest.

Betty was to receive the personal property in the home with the exception of certain stated possessions which went to Arvid.

Betty was to assume all obligations with regard to the indebtedness against the family home and Arvid was to assume all other indebtedness of the parties.

Arvid was to pay $1,750 for Betty's attorney fees.

It is in regard to the above award of alimony, child support, attorney fees, and division of property that Arvid appeals to this court.

■ The law in this area is quite clear and has been stated many times in the past by this court. The trial court's determination on matters of child support, alimony, and division of property are treated as findings of fact. Kostelecky v. Kostelecky, 251 N.W.2d 400 (N.D.1977); Larson v. Larson, 234 N.W.2d 861 (N.D.1975). Our scope of review on appeal of these findings is limited by Rule 52(a), N.D.R.Civ.P., and thus we will not set aside those findings unless they are clearly erroneous. A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. Kostelecky v. Kostelecky, supra; Rambel v. Rambel, 248 N.W.2d 856 (N.D.1977); In re Estate of Elmer, 210 N.W.2d 815 (N.D.1973).

■ There is no clear rule by which division of property is to be made in a divorce case and the determination of what is an equitable division lies within the discretion of the trial court. Kostelecky v. Kostelecky, supra; Johnson v. Johnson, 211 N.W.2d 759 (N.D.1973). However, the trial court is given some guidelines to follow in making these determinations. Section 14–05–24, N.D.C.C., states:

"When a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper, and may compel either of the parties to provide for the maintenance of the children of the marriage, and to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively. The court from time to time may modify its orders in these respects."

■ This court has stated that in determining the division of property under this section, the trial court may consider the respective ages of the parties to the marriage, their earning abilities, the duration of the marriage and the conduct of each during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at that time, its income producing capacity, if any, whether accumulated before or after the marriage,

and such other matters as may be material. *E. g. Bohnenkamp v. Bohnenkamp*, 253 N.W.2d 439 (N.D.1977); *Johnson v. Johnson, supra; Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966).

■ Likewise, attorney's fees stemming from an action for divorce are to be awarded in the discretion of the trial court. The trial court's decision as to whether or not attorney's fees will be awarded will not be interfered with on appeal unless the appealing party affirmatively establishes that the trial court has abused its discretion. *Bohnenkamp v. Bohnenkamp, supra; Hoster v. Hoster*, 216 N.W.2d 698 (N.D.1974); *Halla v. Halla*, 200 N.W.2d 271 (N.D.1972).

The trial court, in its memorandum opinion, stated: "In making a determination in this case the Court is bound by the factors set forth in *Fischer v. Fischer*, 139 N.W.2d 845. I have reviewed these factors and I have considered them in arriving at this determination."

We must review the trial court's decision also in light of the *Fischer* guidelines to determine whether it is clearly erroneous and, if found to be clearly erroneous, in what respects it is so.

The trial court in its findings of fact stated at paragraph XXVI that the financial condition of the parties is as follows:

ASSETS:

| | |
|---|---|
| Note from OK Implement | $25,000.00 |
| Equity in residence | 29,197.85 |
| Household goods, furniture and other personal property in residence insurable value | 10,000.00 |
| Furniture and furnishings in possession of defendant | 1,500.00 |
| Cash belonging to defendant in possession of defendant's father | 2,000.00 |
| Cash in plaintiff's possession | 341.47 |
| Profit sharing | <u>12,828.04</u> |
| | $80,867.36 |

LIABILITIES:

| | |
|---|---|
| First International Bank | $ 1,000.00 |
| Bob's Appliance | 562.64 |
| Standard Oil | 225.00 |
| MDU | 17.30 |
| Fargo and Minot Hospital and Miscellaneous | <u>1,000.00</u> |
| | $ 2,804.94 |
| NET | $78,062.42 |

Although conflicting values are ascribed to the personal property retained by Betty, varying between $5,000 and $10,000; and although the value of certain property taken from the household by Arvid has not been determined; we think that, for the purpose of determining the issues in this case, if we use the lower figure in the one instance and ignore the value of the property of Arvid upon which there is no testimony of value, we may proceed to a determination of those issues.

As a result of the trial court's division of the property then, the parties received the following property with the values given in round figures:

| BETTY | | ARVID | |
|---|---|---|---|
| Home | $29,197.00 | Cash | $ 2,000.00 |
| Cash | 341.00 | Profit Sharing | 12,828.00 |
| Personal Property | 5,000.00 | Personal Property | 1,500.00 |
| | $34,538.00 | | $16,328.00 |
| | | Less Liabilities Assumed | 2,804.00 |
| | | | $13,524.00 |

In addition to the above, Betty also received the following:

| | | |
|---|---|---|
| Alimony | $ 7,800.00 | ($300 per month for 26 months) |
| Promissory note from OK Implement | 25,000.00 | (with interest at 8% per annum) |
| Child support | 300.00 | per month ($150 per month for each minor child) |
| Attorney fees | 1,750.00 | |

The trial court, in its memorandum opinion, stated that the total amount of alimony was the $7,800 plus the $25,000 note. The $300 a month alimony for 26 months ends the month the promissory note comes due. Thus, when Betty receives the $25,000 note in January 1979, all alimony is to cease. The court went on to state that "[w]hether you call it alimony or a property division, she is entitled to this amount of money over and above the other property awarded her. The $25,000 note protects her interest."

Adding the $7,800, the $25,000 note, and the $1,750 attorney fees to the above property division figures, gives Betty $69,088 plus $300 a month in child support, as compared to $13,524 for Arvid.

The trial court, in its findings of fact and memorandum opinion, emphasized the earning ability of Arvid and two transactions in which Arvid was involved. The first of these transactions was the sale of the O.K. Implement stock by Arvid for $25,000 just prior to the commencement of the divorce action. In its memorandum opinion, the trial court stated:

"More than just a passing comment should be made about the sale for $25,000 of Mr. Haugeberg's stock in January, 1976, to Mr. Knutson. One cannot help but be suspicious of this transaction. The fact that Mr. Knutson gave Haugeberg a promissory note payable in January, 1979, adds fuel to my doubts that this was a bonafide transaction. . . . I find that Haugeberg sold this stock because of the ensuing divorce."

In a later paragraph in the memorandum opinion, the trial court stated:

"I approach this division of property, etc. that I must make with the thought that the $25,000 sale must stand, but that Mrs. Haugeberg must be protected to some extent because of the action taken by her husband to dispose of his stock."

The second transaction specifically discussed in the findings of fact and memorandum opinion involved a delivery by Arvid of a $6,756 check to a Mrs. Van Maloney. On April 8, Arvid wrote a check on his account in the Northwestern Federal Savings and Loan Association of Williston, North Dakota, and delivered it to Mrs. Maloney in June 1976. She subsequently deposited this check in the Midland National Bank of Billings, Montana, to the credit of a Mr. or Mrs. William A. Maloney. Arvid testified that he owed the Maloneys $1,300, and that in July of 1976 he received $5,400 cash in settlement of that obligation. During that

time, interrogatories were served on Arvid and he did not mention this sum of money.

In the memorandum opinion, the trial court stated, in reference to the above matter:

"I would not say that Haugeberg 'lied' in the answers to the interrogatories . . . but I do find that he was evasive and should have informed his wife's lawyer about the money taken out of the savings bank in Williston."

Further on in the memorandum opinion, the trial court added:

"This delivery of this money to a Mrs. Van Maloney was definitely an evasive tactic by Haugeberg because of his marital troubles."

## PROPERTY DIVISION AND ALIMONY

■ After reviewing the entire record of this case, the *Fischer* guidelines, and the many other divorce cases involving a division of property and an award of alimony decided by this court, we come to the firm conviction that a mistake has been made and that the property division and award of alimony by the trial court in this case is clearly erroneous. With due regard and respect for the opinion of the trial court, we conclude that an *equitable* division of the parties' property as required by Section 14–05–24, N.D.C.C., has not been made.

■ There is, of course, no requirement that a property division be equal in order to be equitable. *Grant v. Grant,* 226 N.W.2d 358 (N.D.1975). This court in the past has upheld many property divisions which were not equal. *Fine v. Fine,* 248 N.W.2d 838 (N.D.1976); *Grant v. Grant, supra; Fischer v. Fischer, supra; Dahl v. Dahl,* 97 N.W.2d 844 (N.D.1959); *Agrest v. Agrest,* 75 N.D. 318, 27 N.W.2d 697 (1947). Those cases, however, can all be distinguished from this case.

First of all, in all those cases both parties received a substantial part of the property to be divided. The divisions were not equal, but in none of those cases did one party get substantially all of the property. In this case, Arvid received only about $13,500 worth of personal property out of the parties' total net property valued at roughly $73,000. In addition, $12,828 of the award to Arvid represents his part of a profit sharing plan which he cannot receive until he terminates his current employment or retires. Also, the percentage of the $12,828 that he can receive on termination of his employment, varies directly with the number of years he remains with the company. He would have to remain with the company 10 years before he could receive the entire amount of the benefits of the profit sharing plan. In this case, Betty received most of the property. For all practical purposes, about all Arvid is left with is his potential earning capacity subject to the obligation to pay alimony, child support, and attorney fees.

Secondly, in the foregoing cases there were reasons for the unequal distributions which do not apply in this case.

In *Agrest,* the wife received the homestead and the other property was divided evenly. The wife in *Agrest* had built this home from profits from her separately owned business. In addition, the divorce was granted on grounds of extreme cruelty and intemperance and the wife had supported the husband at times during the marriage. Furthermore, no alimony was awarded.

In *Dahl* there was only a difference of a few thousand dollars in the amounts awarded. This difference was the result of the trial court taking into consideration the property which the parties separately inherited during their marriage.

In *Fischer,* the court divided the personal property equally and gave the husband 440 acres of land and the wife 400 acres, including the homestead. The husband claimed his land was worth about $5,000 less than the land given to his wife. The parties in that case had been married for 30 years and the wife was granted the divorce on the grounds of extreme cruelty.

In *Grant,* the husband was awarded property worth $227,210, and the wife was awarded property worth $183,263. In addition, the wife was awarded $350 alimony a month until she died. This division was the result of Mr. Grant being the sole breadwinner and, more importantly, because much of the parties' property was given to the Grants by his parents.

In *Fine,* the husband received the greater share of the parties' property in that he was given his previously and separately owned property back. This was the second marriage for both parties and this marriage lasted for only about eight years. The court allowed this division by taking into consideration basically the time of acquisition of the property, and the fact that Mr. Fine had suffered a diminution in his assets during the first three years of the marriage in the sum of $90,000.

In this case, the factors which are present do not, in light of the award of alimony and the requirement of child support payments, justify such an unequal division of property. This can best be seen by applying the *Fischer* guidelines to the facts of this case.

First of all, considering the ages of the respective parties, Arvid being 39 at the time of the trial, and Betty 40, there is not sufficient variance in their ages to justify different treatment.

The next factor to consider is the earning abilities of the parties. Arvid has a Bachelor of Science degree in math and science from Minot State College and has been employed as a salesman since being graduated in 1959. The records show his income for the last three years to be as follows:

| Year | Salary | Bonus | Total |
|------|--------|-------|-------|
| 1973 | $ 12,000 | $ 13,750 | $ 25,750 |
| 1974 | 14,400 | 12,600 | 27,000 |
| 1975 | 14,400 | 17,350 | 31,750 |

In addition, the records show that he received a bonus in 1970 of $2,800, in 1971 of $7,650, and in 1972 of $8,575. There was also testimony by Mr. Oscar Knutson that because Arvid was controlling his drinking he was a more valuable employee. Finally, there was testimony by Oscar Knutson and Arvid that there may not be a bonus in 1976.

Betty is a high school graduate and has worked outside of the home at times during the marriage. She is currently employed as a bookkeeper for two firms in Watford City with a gross salary of $561 a month.

Arvid, therefore, clearly has the greater earning ability, which means not only that he will be more able to support himself in the future, but also that his earnings have been mainly responsible for the accumulation of the parties' property during the marriage.

We think the difference in earning capacity justifies requiring Arvid to pay alimony and child support and should be taken into consideration in determining the property division, but we do not believe that it justifies awarding almost all of the real and personal property of the parties to Betty.

The next factor to be considered is the duration of the marriage and the conduct of each during the marriage. The Haugebergs were married in 1956 and thus were married for about twenty years before the divorce. Arvid testified that Betty had been a good wife and mother during this time. Arvid, however, was not such a good husband and father. The evidence shows that Arvid, over the years, drank to excess and physically abused Betty. While apparently under the influence of alcohol, he disrupted the family home by ejecting the two oldest children from the family home while they were coming to the aid of their mother. We must conclude that from this the trial court could easily have concluded that if one of the parties was to bear a greater burden than the other from the separation, that party should be Arvid, the one guilty of misconduct during the marriage.

This is not to say, however, that because of the misconduct, Arvid should be deprived of basically all of the physical assets of the family. Such conduct was present in many

of the cases decided by our court where a more nearly equal division of the property was approved.

Another consideration is the parties' station in life and the circumstances and necessities of each. This can best be shown by each party's list of necessary living expenses as offered and received in evidence at the trial.

BETTY

| | |
|---|---|
| House payment, tax, Maintenance | $ 175.00 |
| MDU | 60.00 |
| Telephone | 25.00 |
| Water | 15.00 |
| Groceries | 400.00 |
| Clothing | 150.00 |
| School | 25.00 |
| Kid's Allowance | 60.00 |
| Miscellaneous | 75.00 |
| Dental & Medical | 50.00 |
| Transportation (Lic., Ins., Main.) | 50.00 |
| Car Payment & Gas | 150.00 |
| | $1,235.00 [1] |

ARVID

| | |
|---|---|
| Rent | $ 160.00 |
| Gas/electricity, water | 70.00 |
| Telephone | 20.00 |
| Clothing | 85.00 |
| Laundry | 22.50 |
| Food | 250.00 |
| Church | 75.00 |
| Transportation | 75.00 |
| Drugs/medical | 25.00 |
| P. P. Insurance | 10.00 |
| Life Insurance | 20.00 |
| | $812.50 [2] |

At the time of the trial, Betty had two minor children living with her, Mitchael, age 15, and Jeffrey, age 17, along with Carrie who was 18 but living at home and going to high school. Arvid, of course, had no children living with him. Much of these expenses go to the issues of alimony and child support.

The health and physical condition of the parties is another factor in the *Fischer* guidelines. Arvid has had a drinking problem for which he has received treatment. He testified that he had not had a drink for six months prior to the trial. He also has high blood pressure, has undergone surgery, and has been in intensive care units for a heart condition. The trial court in its finding of fact in paragraph XVI, stated that Arvid appeared to be in good physical condition at the time of the divorce hearing.

Betty is in good physical condition with her only trouble being a stomach condition for which she takes no medicine.

From this we conclude that Arvid's health is not as good as Betty's, and that it may depend greatly upon his ability to control his drinking problem.

Their financial circumstances as shown by the property owned at the time, its value at that time, and its income producing capacity, if any, is another factor. This has been discussed and set out earlier in this opinion. The net value of the property was roughly $73,000. The income producing capacity of their property was really limited to the 8% interest on the $25,000 note from O.K. Implement.

When this property was accumulated is also a factor to be considered. In this case, all the parties' property was accumulated during the course of their marriage. The parties were essentially without funds at the time of their marriage and neither party received any personal or real property during the course of marriage by gift or inheritance.

1. Arvid contends that this amount includes the living expenses of Carrie who is already 18 but living at home. He contends that this figure should therefore be reduced by $165. Without determining whether or not the responsibility to support a child automatically terminates at majority, which issue was not briefed or argued, we do not think that the amount listed is excessive for two children.

2. In exhibit A, this figure was erroneously listed as being $894.50.

The final *Fischer* guideline requires consideration of any other material matter. The trial court here could certainly consider what it referred to as the "suspicious" stock transaction, and the "evasive" delivery of the check to the Maloneys discussed earlier. Also relevant here is the fact that Arvid spent $1,500 on his clothes for his own purposes within two months prior to the divorce hearing.

Taking into consideration all the guidelines discussed above, although there are reasons for allowing alimony and child support, the inequitable division of property cannot be sustained. The property was all accumulated during the course of the marriage in this case, unlike *Dahl, Grant,* and *Fine*. Unlike *Agrest,* Betty in this case did not acquire this property basically out of her own earnings. She did contribute substantially by her outside earnings, but Arvid was clearly the major breadwinner.

In Betty's favor is Arvid's conduct during the marriage, and his "suspicious" stock transaction and his "evasive" delivery of the check. This must be balanced though with Arvid's health and physical condition which has been very much of a problem for him in the past and may continue to be in the future.

Finally, Betty's station in life can be maintained and her necessities met by her current income, supplemented by alimony and child support payments. If conditions change, either party may seek a modification of judgment respecting alimony and child support pursuant to Sections 14–05–24 and 14–05–25, N.D.C.C.

Therefore, we are left with a definite and firm conviction that a mistake has been made in this case. We think that this mistake can be best corrected by ordering that the $25,000 promissory note from O.K. Implement be divided equally between the parties. Arvid and Betty should each be awarded $12,500 of the promissory note along with their share of the accrued interest. By doing this, the property division will be as follows:

| BETTY | | ARVID | |
|---|---|---|---|
| Home | $29,197.00 | Profit Sharing | $12,828.00 |
| Promissory Note | 12,500.00 | Promissory Note | 12,500.00 |
| Personal Property | 5,000.00 | Personal Property | 1,500.00 |
| Cash | 341.00 | Cash | 2,000.00 |
| | $47,038.00 | | $28,828.00 |
| | | Less Liabilities Assumed | 2,804.00 |
| | | | $26,024.00 |

Because of Arvid's greater earning potential, the alimony payment ordered by the trial court of $300 per month will be continued until Arvid's death or until Betty remarries. The child support payments should be continued as ordered by the trial court, as we will later discuss herein.

It is possible that under our division of the property and order of alimony for an indefinite period Arvid may ultimately be obligated in a greater amount than under the trial court's order of lump sum alimony. Notwithstanding, we believe that this division is equitable for three reasons: (1) The burden on Arvid will be spread out over a longer period of time and he will have one-half of the promissory note plus accrued interest on that part of the note to invest or use as he deems appropriate. (2) The payment of alimony to Betty on a continuous basis should make it possible for her to maintain her present standard of living for a longer period of time, considering Arvid's life expectancy of 33.1 years. Am.Jur.2d Desk Book, Doc. No. 141.1. (3) The award of periodic alimony, as opposed to a lump sum alimony, permits either party to seek a modification of the judgment respecting alimony if conditions change. We are cognizant that the continuance of alimony will depend upon Arvid's ability to maintain his sobriety which is by no means

a certainty, but with this distribution of assets, we are hopeful that he will be encouraged to make every effort to do so.

## CHILD SUPPORT

■ The trial court ordered Arvid to pay $150 a month to each of the two minor children of the marriage until they reach the age of 18 or cease to be Betty's dependents. On the record before us we are not convinced that a mistake was made by the trial court in awarding that amount of child support.

In his brief to the court, Arvid cited *Larson v. Larson*, 234 N.W.2d 861 (N.D. 1975), and *Hoster v. Hoster*, 216 N.W.2d 698 (N.D.1974) in his attempt to show that the award of child support and alimony should be held clearly erroneous. This court, in *Schnell v. Schnell*, 252 N.W.2d 14, 20 (N.D. 1977), stated the following about the *Larson* and *Hoster* cases.

"In *Hoster* and *Larson*, it [the reducing of alimony and support by this court] was based upon changes of circumstances which made it extremely difficult or impossible for the spouse paying the alimony and support money to provide for his own needs after support and alimony payments had been paid."

In this case, the record does not indicate that it would be extremely difficult or impossible for Arvid to provide for his own needs after support and alimony payments have been paid providing he continues in his present employment and receives his usual year end bonuses. Furthermore, the record shows that this alimony and child support money is needed by Betty to make ends meet.

The trial court had the income records of Arvid over the last several years and other relevant data before it. Although Arvid's income is quite variable and unpredictable because of the bonuses he receives, the trial court could reasonably have decided that his income is sufficient to meet the child support and alimony awards. Since none of us

can predict the future with assurance, we do not find error where the court has done the best it could and we could do no better. *Rambel v. Rambel*, 248 N.W.2d 856 (N.D. 1977). We therefore conclude that this finding is not clearly erroneous.

## ATTORNEY FEES

■ The trial court ordered Arvid to pay $1,750 for Betty's attorney fees. We have said that a decision of the trial court on the allowance of attorney fees will not be interfered with on appeal unless the appealing party affirmatively establishes that the trial court has abused its discretion. *Bohnenkamp v. Bohnenkamp*, 253 N.W.2d 439 (N.D.1977); *Hoster v. Hoster, supra*. Arvid has not affirmatively established that the trial court abused its discretion in awarding attorney fees in this case and we therefore uphold the trial court's award in this respect. *See Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966).

For the reasons stated in this opinion, the judgment appealed from is affirmed except for the property division and the award of alimony. This case is remanded with instructions to the trial court to modify the judgment accordingly. Costs on appeal shall be awarded to Arvid.

SAND and PAULSON, JJ., concur.

VOGEL, Justice, dissenting.

I dissent from the modification of the property division ordered by the trial court. I am not convinced that an error was made by the trial court. On the contrary, I think the trial court's decision is eminently correct and the majority's is wrong.

I agree entirely with Justice Pederson's remarks, and have some of my own to add.

## I. EARNING ABILITY AND WORTH OF HOUSEWIFE

The so-called *"Fischer* guidelines"[1] include as one of the matters to be considered

---

1. The body of the opinion in *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966), copies the guidelines from *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952), but the syllabus adds the words "and such other matters as may be material." *Ruff* took its language from Nebraska cases. See *Ruff*, 52 N.W.2d at 111–112.

the earning ability of the parties. The majority, in purporting to discuss earning ability, turns the whole concept upside down. To me, it is obvious that we must consider earning power of the parties in order to make allowances to the party who has the smaller earning power. But the majority opinion refers to the higher earning ability of the husband here as a reason for giving him a larger share because "his earnings have been mainly responsible for the accumulation of the parties' property during the marriage"! Such reasoning magnifies inequity instead of reducing it.

Wives usually have less earning power than husbands. They get no wages for cooking, cleaning, and caring for children. If they had earning ability before marriage, it withers away from lack of employment or from being used only in part-time jobs. In the meantime, husbands gain experience, seniority, and better pay. Without the wife at home to take care of the household, the husband would be unable to obtain the earning ability he has. The fact is that the employed spouse's earning power is often the most valuable single asset of the marriage, and the other spouse contributes equally to its acquisition.

Some supreme courts have recognized the worth of the work the wife does, although ours gives wives little credit. In Wisconsin it is recognized that the contribution of a full-time homemaker may be considered greater than, or at least as great as, that of a working spouse. *Wilberscheid v. Wilberscheid,* 77 Wis.2d 40, 252 N.W.2d 76 (1977). In the view of that court, it makes little difference that one spouse works outside the home and the other within—Wisconsin considers the marital union as a partnership. We should do likewise.

Coming now to the case before us, the earning ability of the husband rose from $25,750 in 1973 to $31,750 in 1975. The wife's earning ability is $7,692 per year ($641 per month). Even if we take $25,000 as the husband's earning ability and reduce it by $300 per month for alimony, he still will have $21,400 per year compared to her $7,692, or about $13,700 more income per year.

The trial court awarded her property valued at $69,088 and to him property valued at $13,524, a difference of $55,564. At $13,700 per year he can make up the difference in about four years, or by the time he is 43 years of age, with no wife or dependents.

I do not understand how this is inequitable or unfair to him.

The majority opinion is far worse. It gives a difference of only $21,000 in the property division, which the husband can make up out of his higher earning ability in about a year and a half. That is inequitable to her.

## II. FAULT

So far, I have not even mentioned the concept of fault, called "conduct of the parties" in the *Ruff-Fischer* guidelines. As I have indicated above and in a dissent in *Hegge v. Hegge,* 236 N.W.2d 910 (N.D. 1975), and in a concurring in part/dissenting in part opinion in *Hultberg v. Hultberg,* 259 N.W.2d 41 (N.D.1977), I believe that this court, which put in fault as a matter to be considered in making property divisions, should take it out and should consider property matters in divorce cases as we would consider property matters in dissolving a partnership.

Be that as it may, the majority, which says that fault should be considered, has given me no evidence that it has done so. The fault in this case, according to the trial judge (and the majority does not contradict him), is entirely that of the husband. Then where is the punishment he is to receive for his fault? Certainly not in the property division which I have already discussed.

I think the time has come to analyze how the concept of fault has been applied in property division in this court in the past, ever since the *Ruff* case was decided in 1952. There are approximately 30 cases which have referred to the *Ruff-Fischer*

guidelines since then. Without taking the space to list them all, I assert that an analysis of the opinions will show that in North Dakota:

(1) If the husband is at fault, he will get half or more of the property [for example, *Ruff, supra,* and *Fischer, supra* ].

(2) If the wife is at fault, she will get little or nothing [for example, *Hegge v. Hegge, supra* (even limited alimony taken from her), and *Ferguson v. Ferguson,* 202 N.W.2d 760 (N.D.1972)].

(3) If both are at fault, the division will be approximately equal [*Bellon v. Bellon,* 213 N.W.2d 376 (N.D.1973), and *Larson v. Larson,* 234 N.W.2d 861 (N.D.1975)], or the wife may get somewhat less than half [*Grant v. Grant,* 226 N.W.2d 358 (N.D. 1975)].

Of these three categories, the third one is the only one I could consider as equitable (if fault is considered, as the majority says it must be).

For this state of affairs I assign no blame. Some of the reasons may be historical. Trial courts have tried to follow our direction, and we have tried to give their rulings the respect due them under Rule 52(a), N.D.R.Civ.P. Regardless of causes, the results are not felicitous.

### III. PROPERTY DIVISION v. ALIMONY

The majority opinion indicates that alimony is a substitute for division of property. Sad experience indicates to me that it is not. Alimony (unless specifically ordered otherwise) ends when either party dies, or the wife remarries. In other words, the wife loses her share of the accumulation during the marriage if she remarries, and her heirs lose it when she dies. This is scarcely just. Furthermore, much alimony ordered to be paid never is paid, and less and less is paid as the years roll by. Earnings drop and people move away or hide, and collecting alimony across State lines is even more frustrating than intrastate.

The Uniform Marriage and Divorce Act, which is the product of the most thorough examination of the actualities of divorce law in recent years, takes the view that property division, to the extent possible, should be "the primary means of providing for the future financial needs of the spouses." 9 Uniform Laws Annot., Master Ed., p. 457.

By making appropriate divisions of property, courts can be sure that each party gets his or her share of the marital property. If alimony is awarded, there is no certainty that it will be paid.

### CONCLUSION

For all these reasons, as well as having a proper respect for Rule 52(a), N.D.R.Civ.P., I would affirm the decision of the district court.

One last note: As I indicated, I believe this court should rescind its court-created consideration of (or lip-service to) the concept of fault as one of the grounds for division of property (and also as one of the grounds for granting custody, except to the extent that the misconduct affects the ability to care for children, but I leave that question for another day).

If this court refuses to take this step (which should be taken for reasons which I have stated in this dissent and in the dissent in *Hegge, supra,* and in the concurrence/dissent in *Hultberg, supra* ), then the Legislature should take action to implement what it thought it was doing when it adopted the law on irreconcilable differences (see my concurrence/dissent in *Hultberg, supra* ).

Only by some such action can we bring North Dakota divorce law into the twentieth century, and begin to regard marital breakdown as something to be recognized and treated as painlessly and considerately as possible, and not as an occasion for gladiatorial combat.

PEDERSON, Justice (dissenting).

The majority opinion recites a proper premise under Rule 52(a), North Dakota Rules of Civil Procedure, that we will not set aside a finding of fact unless it is clearly

erroneous. That means, upon the entire evidence, we must be convinced that a mistake has been made. The majority then determines what the finding should be (on property division and alimony), and then concludes that this may ultimately obligate Arvid in a greater amount than under the trial court's finding. To that extent it appears to me that we are saying to Arvid—you win but you lose. When the trial court did its best and we can do no better, we should leave well enough alone. *Rambel v. Rambel,* 248 N.W.2d 856 (N.D.1977). We are here vacating our function as the reviewing court and exercising the prerogatives of the trial court.