**Reed E. SANFORD, Plaintiff and Appellee,**

v.

**Glenda L. SANFORD, Defendant and Appellant.**

**Civ. No. 9771.**

Supreme Court of North Dakota.

Dec. 19, 1980.

Rehearing Denied Jan. 23, 1981.

Randolph E. Stefanson, Stefanson, Landberg & Alm, Ltd., Moorhead, Minn., for defendant and appellant.

Donald R. Hansen, Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, for plaintiff and appellee.

PAULSON, Justice.

Glenda Sanford ["Glenda"] appeals from an amended judgment of the Cass County District Court which was entered on January 25, 1980. Reed Sanford ["Reed"] commenced this action for divorce on December 30, 1977. Glenda also sought a divorce and the trial commenced on April 24, 1979. The district court issued a judgment on July 5, 1979, in which the district court granted each party a divorce on the ground of irreconcilable differences, made a division of property, and awarded alimony and child support. On July 19, 1979, Glenda made a motion requesting that the district court

amend its findings of fact, conclusions of law, order for judgment, and judgment, and on January 25, 1980, the district court issued an amended judgment of divorce. Judgment modified and, as modified, affirmed.

This case was previously appealed to this court. In *Sanford v. Sanford*, 295 N.W.2d 139 (N.D.1980), we held that Glenda's acceptance of payments under the divorce decree did not act as a waiver of her right to appeal from the judgment of divorce. Glenda and Reed were married on June 17, 1955, near Princeton, Minnesota. Reed attended dental school at the University of Minnesota after the parties were married. During this time, Glenda changed her college major from education to dental assistant in order to support the parties during the college years and to assist Reed upon his graduation from dental school. Glenda was employed by the University of Minnesota Health Service. Upon Reed's completion of dental school in the fall of 1958, Reed and Glenda moved to Crookston, Minnesota where Reed began an orthodontia practice. Reed also worked in an orthodontia practice in Fargo, North Dakota; and in 1960 he purchased the Fargo practice and Glenda and he moved to Fargo. Glenda performed the bookkeeping services for the orthodontia practice in Fargo and also assisted in the management of the office. In addition, Glenda was active in local and state dental organizations in order to promote Reed's orthodontia practice. Three children were born of the marriage.

Since the time that the parties were married, they have acquired much real and personal property. This appeal by Glenda focuses upon the valuation of the property acquired during the marriage as well as the division of property made by the district court. The property owned by the parties as well as the value ascribed to the property by the district court is as follows:

1. Residence at 2433 East Country Club Drive, Fargo — $175,000.00
2. Lake cottage on 8th Crow Wing Lake near Nevis, Minnesota — 59,000.00
3. Office building at 1017 Broadway, Fargo — 73,000.00
4. One-half interest in Nash-Finch warehouse, 3101 12th Avenue North, Fargo (H & S Inv.) — 0.00
5. Duplex, 1001–1003 Broadway, Fargo — 41,000.00
6. J. C. Penney Building, Montevideo, Minnesota — 85,000.00
7. 95-acre farm near Princeton, Minnesota — 33,800.00
8. Marketable securities: — 246,732.00
9. Capital stock interest in Reed E. Sanford, D.D.S., Ltd. — 97,560.00
10. Investments in partnerships — 70,510.00
11. Notes receivable — 7,000.00
12. Family home furnishings — 15,000.00
13. Bank and savings accounts — 19,200.00
14. Accounts receivable—dental practice — 317,000.00
15. Reed E. Sanford, Ltd., pension and profit sharing plan — 280,558.00
16. Debenture note — 8,522.00
17. Cash — 4,254.00
18. Motor vehicles — 14,000.00

The district court made the following distribution of the property in the amended judgment:

1. Glenda was awarded the family residence located at 2433 East Country Club Drive, Fargo

2. Glenda was awarded the family home furnishings

3. Glenda was awarded a Buick Electra automobile

4. Glenda was granted two cash awards, one for $75,000.00 payable on or before July 1, 1979; and another for $25,000.00 payable on July 1, 1982.

5. Glenda was awarded as a property settlement the sum of $200,000.00 payable in the amount of $1,700.00 per month commencing on June 15, 1979, and payable monthly until July 15, 1989.

6. Glenda was awarded the cash value of two life insurance policies and received her share in pension and profit sharing plans.

7. Glenda was given the option to purchase farm property located near Princeton, Minnesota, at any time up

to January 1, 1990, for the sum of $30,000.00.

8. Glenda was granted the custody of two of the three children born of the marriage. Reed was ordered to pay $400.00 per child per month to Glenda as support for the children.

9. Reed was required to provide all medical and dental care for the children as well as maintain all life insurance policies on his life with the children as equal co-beneficiaries until they reach majority. Reed was also required to provide for the post-secondary education of the children; however, Reed was allowed to claim the three children as dependents for income tax purposes.

10. Reed received his stock ownership in Reed E. Sanford, D.D.S., Ltd.

11. Reed received his share of the pension and profit sharing plans.

12. Reed received his interest in the partnership, H & S Investment Co., which has as its primary asset a commercial warehouse. Reed also received other assets by provision of the court. These assets totaled $212,832.00. The district court directed each party to pay their attorney fees, expert fees, and costs incurred in the action.

13. The district court determined that the net worth of the parties was $1,108,700.00. Glenda's share of the net worth which she received in the district court's distribution of assets was $517,750.00. Reed received $590,950.00 in the district court's distribution of assets.

The parties stipulated to the value of certain assets. These assets are as follows:

| | | |
|---|---|---|
| 1. | Marketable securities | $246,732.00 |
| 2. | Note receivable | 7,000.00 |
| 3. | Debenture note | 8,522.00 |
| 4. | Cash | 4,254.00 |
| 5. | Oil partnership | 70,510.00 |
| 6. | Real estate investments | 291,800.00 |

The district court determined the value of certain other assets. The value attributed to these assets is disputed by the parties.

These assets and their value as determined by the district court are as follows:

| | | |
|---|---|---|
| 1. | Capital stock, Reed E. Sanford, D.D.S., Ltd. | $ 97,560.00 |
| 2. | H & S Investment Co. | 0.00 |
| 3. | Family residence | 175,000.00 |
| 4. | Family home furnishings | 15,000.00 |
| 5. | Pension and profit sharing plan | 280,558.00 |
| 6. | Motor vehicles | 14,000.00 |

The issues which Glenda raises for our consideration are as follows:

1. Whether or not the district court's valuation of Reed's interest in H & S Investment Co., and the capital stock of Reed E. Sanford, D.D.S., Ltd., was clearly erroneous.

2. Whether or not the district court's determination of an equitable distribution of the marital estate and the award of alimony and child support was clearly erroneous.

3. Whether or not the district court committed error when it failed to award Glenda attorney fees and expert witness fees during the maintenance of the action.

I

Reed owns a fifty percent interest in H & S Investment Co., which is a partnership in which Reed is a member and the main asset of the partnership is a commercial warehouse located in Fargo and known as the Nash-Finch Building. At trial, both Reed and Glenda presented experts who testified as to the value of the warehouse. Glenda's expert testified that Reed's interest in the warehouse should have had a minimum value of $325,000.00. This sum was arrived at by reviewing the partnership agreement for H & S Investment Co. This agreement dated February 6, 1969, between Reed and Philip L. Hagen contained the following provision:

"Provided, however, that notwithstanding the foregoing and under no circumstances shall the value of the so-called Nash-Finch Building, which is an asset of the partnership, be valued at less than the sum of $650,000.00 which was the purchase price of the building, plus a sum

equal to the cost of any improvements or additions made to the building and paid by the parties to this agreement for a period up to two years from the date hereof."

Glenda's expert arrived at the $325,000.00 minimum valuation of the building by dividing the $650,000.00 value of the building as ascribed in the partnership agreement by Reed's fifty percent partnership interest. Glenda's expert asserted that the assessed value which the City of Fargo placed upon the warehouse should have been the true value of the building. Glenda's expert applied a segregated cost method which examined each component part of the warehouse building, according to the principles of the Marshall-Swift Valuation Service. By applying these principles, Glenda's expert arrived at the value of the warehouse which attributed $86,000.00 to the land, $1,683,023.00 to the warehouse, and $1,769,023.00 as the total. Reed presented the testimony of two expert appraisers who ascribed a negative $25,000.00 and negative $60,000.00 value to the building. The disparity in the valuation of the building by the experts resulted from the different methods of valuation used by the experts. In estimating the value of real estate, the real estate appraiser recognizes three standard approaches to value. These approaches are the cost approach, the income approach, and the market data approach.[1] Reed's experts used the income approach of valuation while Glenda's expert used the cost approach of valuation.

The building was originally constructed in 1961 and additions were made in 1972 and in 1974. At the time of trial, the roof was in need of repairs but the building was in average condition overall. The current lease on the building was written in 1969; however, the lease was amended on several occasions since 1969 because of the transfer of ownership and because of the additions made to the structure. The lease contained a term of 25 years with three options to renew the lease for 5 years each, which could extend the lease to the year 2009. Reed's expert appraisers determined that the current tenant would exercise the options because the current rental on the building was below the market rent on the building and because the lease contained no escalation clauses to increase the rent due under the lease unless additions were made to the structure. In addition, the lessor was responsible for maintaining the exterior and structural parts of the building, which included the roof, walls, floors, and service areas of the building. Thus, the economic rent on the building exceeded the contract rent.

The bundle of rights theory of appraisal holds that the ownership of real property may be compared to a bundle of sticks wherein each stick represents a separate right or privilege of ownership. These rights are inherent in ownership of real property and consist of the right to use real property, to sell it, to give it away, to lease it, and the right to refuse to exercise these rights. An owner of real estate who leases real estate transfers the right to use or occupy the property to the tenant and receives rent as compensation for the temporary relinquishment of this interest in the real estate. After the lease is consummated, the owner of the property possesses the rights under the lease and the income it commands, together with the title to the real property which includes the recovery of the use and occupancy of the real property at the expiration of the lease. Thus, the owner of real property who executes a lease on the property divides his bundle of rights into two separate interests commonly referred to as the leased fee estate, and the

---

1. The cost approach involves the sum total of the current costs of reproducing the property, less depreciation, from all sources. The value estimated by this approach assumes that the cost of reproduction sets the upper limit of value.

The income approach requires the processing of income, usually by capitalization, to produce a value. The value estimated is supported by the projected earning power of the property.

The market data approach estimates value by considering recent sales of the most nearly comparable properties in the market. It is based on the theory that property cannot be worth more than the cost of a similar property.

leasehold estate. The building was built in 1961. Reed's experts determined that the building would have little value at the end of the lease because the warehouse had a typical physical life of forty-five years under the Marshall-Swift Valuation Service. The value of the site rested in the reversionary value of the property to the owner at the end of the lease. Reed's experts determined that the site had a value of $25,000.00 per acre. The 8.3-acre area on which the warehouse is built was determined to be worth $207,500.00.

The Inwood Technique is used to value long-term leases with level income streams. This technique assumes that an investor would purchase a property subject to a lease, based on the summation of the present worth of the income stream and reversion of the property discounted at a rate comparable to that of similar investments. The capitalization rate used was eleven percent. The present worth of the income stream from the building can be summarized as follows:

| | | |
|---|---|---|
| Original term—Monthly net income (remaining term) | | $ 6,329.38 |
| Discount rate (15 years at 11% monthly) | | x 87.98 |
| | | $556,858.85 |
| Option term—Monthly net income (option period) | | $ 5,991.88 |
| Discount rate (15 years at 11% monthly deferred 15 years) | | x 17.03 |
| | | $102,041.72 |
| Total worth of the income streams ....... | | $658,900.57 |
| Present worth of the reversion | | |
| Land value | | $207,500.00 |
| Discount rate (30 years at 11%) | | .0467 |
| | | $ 9,690.25 |
| Estimated value by the Inwood Technique: | | |
| Present worth of the income streams | | $658,900.00 |
| Present worth of the reversion | | 9,700.00 |
| | | $668,600.00 |

The roof on the building required $175,000.00 in repairs. At least $129,000.00 of the repairs needed to be completed at the time of the trial. Under the lease agreement, this repair work must be completed before Reed may receive income from the property. Thus, the estimated market value of the site is reduced by the $129,000.00 figure and the estimated market value decreases to $540,000.00.[2] The estimated market value of the site is based upon the value of the property being free and clear of all encumbrances. However, three outstanding loans against the property total $660,667.54. Thus, the estimated market value of the building can be summarized as follows:

| | |
|---|---|
| Estimated market value (lessor's interest) | $540,000.00 |
| Less mortgage balance | − 660,000.00 |
| Equity position (½ interest in the lessor's interest) | − $120,000.00 |
| | x ½ (Reed's interest) |
| | − $ 60,000.00 |

The district court determined that the site had a zero value despite the fact that Reed's experts placed a negative value on the site. This difference could be the result of the fact that Reed's experts did not account for the appreciation of the land's value. However, the authorities on appraisal of property differ as to whether appreciation of the land should be considered in this context. The trial court's findings of fact will not be set aside on appeal unless they are clearly erroneous, pursuant to Rule 52(a) of the North Dakota Rules of Civil Procedure. A finding of fact is clearly erroneous only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. We hold that the district court's finding as to the value of Reed's interest in H & S Investment Co. was not erroneous. The valuation techniques used by Reed's experts were proper and the district court could ignore the valuation placed on the building by Glenda's expert because he failed to account for the encumbrances against the property.

2. In addition, the expert attributed a $670,000.00 value to the building and reduced this figure by $130,000.00, and thus decreased the estimated market value to $540,000.00.

Glenda also contends that the district court's valuation of the capital stock in Reed's professional corporation at $97,560.00 was erroneous. Reed's accountant testified that Reed's corporation was valued at $172,560.00, while Glenda's accountant testified that the value of the corporation was $344,720.00. Glenda's accountant based his conclusion upon the employment agreement signed by Reed and Shelley Townsend Hanson in October of 1978. After Reed incorporated his practice, he employed an additional orthodontist, Shelley Townsend Hanson. Paragraph 10 of the agreement specified a method for valuing the corporation in the event Reed died or was disabled. Paragraph 10 provides as follows:

"(10) In the event of death of the First Party after executing this agreement, Second Party agrees to purchase First Party's practice, equipment, supplies, and accounts receivable on active treatment patients. Second party shall have the option to continue to rent the building from First Party's estate, or purchase the building at fair market value.

"The following terms would apply to the purchase of the practice, equipment, supplies, and accounts receivable:

"A. Practice: Sixty-five percent (65%) of average gross income for past three years.

"B. Equipment and Supplies: Fair market value for items purchased 12 months ago, and original cost of items purchased since 12 months before date of the agreement.

"C. Accounts Receivable Active Cases: The actual amount on books for work completed on each case as determined by the current initial fee and monthly fees for that type of treatment, on the first day of the month in which the First Party is deceased. Accounts Receivable on completed cases: (in retention) shall remain property of the First Party's estate.

"D. The purchase price shall be payable as follows:

1. Cash down payment within 20 days after the values have been agreed upon equal to 20% of the total purchase price. Except that the down payment shall equal any life insurance proceeds on any policy owned by the Second Party on the life of the First Party, but in no event shall the down payment exceed 29% of the purchase price.

2. The unpaid principal balance shall be paid in four equal annual installments and all unpaid balances shall bear interest at the rate of 8% per annum.

3. Purchaser shall deliver reasonable security or collateral to secure the unpaid balances and shall be personally liable for unpaid payments."

Glenda's accountant examined the gross income from the corporate tax returns for the years 1976, 1977, and 1978, and averaged them for three years. The accountant then determined sixty-five percent of that average and arrived at a balance of $170,338.00. The original cost of the equipment totaled $73,159.00, and active accounts receivable totaled $15,000.00. Corporate cash totaled $45,077.00, and investments totaled $49,668.00. The debenture note totaling $8,522.00 was deducted and, thus, the total value of the corporation totaled $344,720.00. The $344,720.00 figure was determined by the provisions contained in Paragraph 10 of the Employment Agreement signed by Reed and Shelley Townsend Hanson in October of 1978. The district court disagreed with the valuation given by Glenda's accountant for a number of reasons.

■ The district court reasoned that the employment agreement was not entered into for the purpose of evaluating the property and that other factors such as pre-billed dental contracts would vary such an agreement. The district court determined that Reed's orthodontia practice consisted of personal services and the value of the practice would be speculative. Finally, the district court determined that the $75,000.00 figure representing pre-billed orthodontia care could not be considered as an asset of the practice because the fees for

pre-billed orthodontia care were contingent upon Reed's performance of the contracted duties. In cases involving conflicting testimony, the reviewing court will give considerable weight to the findings of the trial court because the trial court is able to see and hear the witnesses, and we are not. *Nastrom v. Nastrom*, 284 N.W.2d 576 (N.D. 1976). In *Bosma v. Bosma*, 287 N.W.2d 447 (N.D.1979), we refused to accept a proposed value of a partnership interest based upon values assigned in attempted business loan applications. Similarly, the agreement between Reed and Dr. Hagen as partners in H & S Investment Co., and the agreement between Reed and Shelley Townsend Hanson in the professional corporation are not indicative of the market value of these interests because some of the factors involved in assessing value are speculative in nature. The district court arrived at the $97,560.00 figure by subtracting the $75,000.00 figure for pre-billed orthodontia care from the estimated value of the corporation as determined by Reed's accountant. We conclude that the values assigned by the district court to Reed's partnership interest in H & S Investment Co. and the value of his professional corporation were not clearly erroneous. The trial court is better able to judge the credibility of the witnesses, weigh the evidence, and assign a true value to the property than we are.

Glenda also asserts that the district court's findings of fact as to the value of the marital estate were clearly erroneous. In its Memorandum Opinion, the district court stated that the net estate totaled $1,108,700.00. The district court made the following findings on the value of certain assets whose value Reed and Glenda disputed:

1. Capital stock, Reed E. Sanford, D.D.S., Ltd. — $ 97,560.00
2. H & S Investment Co. — 0.00
3. Family residence — 175,000.00
4. Family residence furnishings — 15,000.00
5. Pension and profit sharing plan — 280,558.00
6. Motor vehicles — 14,000.00
   Total — $582,118.00

Assets whose value was undisputed included:

1. Marketable securities — $246,732.00
2. Note receivable — 7,000.00
3. Debenture note — 8,522.00
4. Other real estate investments (Lake cottage, family farm, duplex, J. C. Penney Building, dental office building) — 291,800.00
5. Cash — 4,254.00
6. Oil partnership — 70,510.00
   Total — $628,818.00
   Overall Total — $1,210,936.00

By examining the district court's specific findings on the assets whose value was disputed and on the assets whose value was undisputed, the gross estate totaled $1,210,936.00. The district court determined that the net estate was $1,108,700.00, which is a $102,236.00 reduction from the amount of the gross estate. Glenda asserts that the district court's determination of the value of the estate was erroneous; however, Glenda's estimate failed to account for approximately $100,000.00 in notes and other payables which must be deducted from the value of the marital estate. Thus, the district court's determinations on the value of the marital estate were correct when the proper deduction for notes and other payables had been made. Glenda asserts that the value of the net estate should have been $1,783,096.00. However, Glenda's assertion is based upon a $344,720.00 valuation of Reed's orthodontia practice and $325,000.00 valuation of Reed's interest in H & S Investment Co. We have concluded that the district court's findings as to the value of these assets were correct. Thus, Glenda's contention that the value of the marital estate should be $1,783,096.00 is mistaken. In addition, when the proper deduction for the notes and other payables is made, the district court's finding as to the value of the marital estate is correct.

Glenda also asserts that the amount of the marital estate which she received totaled $503,048.06, rather than $517,750.00. Glenda's computations are as follows:

1. Lump-sum payment in July, 1980 — $ 75,000.00
2. Lump-sum payment in July, 1982 — 25,000.00
3. Family residence — 175,000.00

4. Contents of the family residence     15,000.00
5. Automobile     7,000.00
6. Glenda's interest in pension and profit sharing plans     6,048.06
7. Property settlement of $1,700.00 per month for 121 months     200,000.00

Total     $503,048.06

Glenda's computations fail to account for the cash value of two life insurance policies which she received which were valued at $9,000.00. In addition, the payment of $1,700.00 for 121 months totals $205,700.00. This figure is $5,700.00 in excess of the amount which Glenda attributed to the property settlement. When the additional $14,700.00 is added to the $503,048.06 total which Glenda asserts is the value of the marital estate, the total value of Glenda's share of the marital estate is approximately $517,750.00. The district court did not err in valuing the marital estate as Glenda's share of the marital estate totaled $517,750.00, while Reed's share of the marital estate totaled $590,950.00.

## II

The next issue raised by Glenda concerns whether or not the district court's determination of an equitable distribution of the marital estate and the award of alimony and child support was clearly erroneous. When a court grants a divorce, § 14–05–24 of the North Dakota Century Code requires that the court "make such equitable distribution of the real and personal property of the parties as may seem just and proper." In determining the division of property, or in determining whether or not either party is entitled to alimony or child support, the trial court may consider the respective ages of the parties to the marriage; their earning abilities; the duration of the marriage and the conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical condition; their financial circumstances as shown by the property owned at the time, its value at that time, its income-producing capacity, if any, and whether accumulated or acquired before or after the marriage; and such

other matters as may be material. *Bender v. Bender*, 276 N.W.2d 695 (N.D.1979); *Fischer v. Fischer*, 139 N.W.2d 845 (N.D. 1966); and *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (N.D.1952).

The trial court's determinations on matters of alimony, child support, and division of property are treated as findings of fact. *Nastrom v. Nastrom*, 284 N.W.2d 576 (N.D.1979); *Haugeberg v. Haugeberg*, 258 N.W.2d 657 (N.D.1977). The findings of fact will not be set aside on appeal unless they are clearly erroneous pursuant to Rule 52(a), N.D.R.Civ.P. A finding of fact is deemed "clearly erroneous" when the reviewing court is left with a firm and definite conviction that a mistake has been made. *Haberstroh v. Haberstroh*, 258 N.W.2d 669 (N.D.1977). The mere fact that the appellate court might have viewed the facts differently, if it had been the initial trier of the case, does not entitle it to reverse the lower court. *Larson v. Larson*, 234 N.W.2d 861 (N.D.1975). We have on numerous occasions stated that in divorce cases the property division need not be equal in order to be equitable. *Bender v. Bender*, 276 N.W.2d 695 (N.D.1979); *Bosma v. Bosma*, 287 N.W.2d 447 (N.D.1979); and *Fries v. Fries*, 288 N.W.2d 77 (N.D.1980). Reed received approximately 54% of the marital estate while Glenda received approximately 46% of the marital estate; however, after carefully reviewing the district court's division of the property, we conclude that the property division was clearly erroneous. On the basis of *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966), and *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (N.D.1952), the district court must consider a variety of factors in making a division of property. We will assess each of these factors.

RESPECTIVE AGES OF THE PARTIES TO THE MARRIAGE: THEIR EARNING ABILITIES: THE DURATION OF THE MARRIAGE AND THE CONDUCT OF EACH DURING THE MARRIAGE

At the time of the trial, Reed was 44 years of age and Glenda was 43 years of

age. The parties had been married for 24 years. There exists a great disparity between the parties' earning abilities. At the time of the trial, Reed was an orthodontist who graduated from the University of Minnesota School of Dentistry in 1958. Reed's income exceeds $100,000.00 per year. At the time of trial, Glenda was not employed but was completing requirements in order to receive a Bachelor of Arts degree in human services and personnel management. The district court estimated that Glenda in the future could receive an income in excess of $10,000.00 per year. After Glenda and Reed contemplated marriage, Glenda changed her college major and began a one-year dental assistantship program in order to support the parties while Reed continued his education. Additionally, Glenda performed substantial services in Reed's orthodontia practice. The conduct of each party during the marriage was not of such an aggravated nature as to appreciably affect the equitable division of the property.

THEIR STATION IN LIFE; THE CIRCUMSTANCES AND NECESSITIES OF EACH; THEIR HEALTH AND PHYSICAL CONDITION

Reed and Glenda achieved financial security during the course of the marriage. They obtained their financial security through their mutual efforts. Neither party suffers from any unusual circumstances nor unusual necessities except for the fact that Glenda must provide the primary care for two children while Reed must provide the primary care for one child. By virtue of the district court's judgment, each party must contribute equally to the children's education. This places a greater necessity on Glenda because her income is far less than Reed's income. The parties enjoy good health. Although Reed suffers from an injury to his right shoulder, the district court determined that his disability was not of such a nature as to appreciably affect his future income-producing capacity.

THEIR FINANCIAL CIRCUMSTANCES AS SHOWN BY THE PROPERTY OWNED AT THE TIME, ITS VALUE AT THAT TIME, ITS INCOME–PRODUCING CAPACITY, AND WHETHER IT WAS ACCUMULATED OR ACQUIRED BEFORE OR AFTER THE MARRIAGE

Reed and Glenda own much property and an equitable division of the property would provide for more than the basic necessities of each party. Many of the assets also possess a high income-producing capacity. The district court's judgment provided Glenda with few assets possessing a high income-producing capacity and consequent tax advantages. Glenda received predominantly cash awards, while Reed received the bulk of the parties' real estate and stock holdings. This distribution of property by the district court was inequitable in view of the fact that the property was acquired subsequent to the marriage through the mutual efforts of Reed and Glenda.

An equitable distribution of property would account for the disparate income-producing capacities of Reed and Glenda, and the fact that the mutual efforts of the parties led to the accumulation of much property. Thus, Glenda must receive all of the marketable securities owned by the parties instead of the $200,000.00 property settlement award made by the district court.[3] In addition, Glenda must receive the 95-acre farm located near Princeton, Minnesota, as part of the property division, rather than the option to purchase the farm property at any time up to January 1, 1990, for the price of $30,000.00. The farm was owned by Glenda's parents and had been a part of the property held by Glenda's family since 1880. In 1965, Reed and Glenda purchased

3. Glenda asserted that the $200,000.00 property settlement award given by the district court was in actuality an award of alimony because Reed was to receive a reduction in his tax liability for the payments made. We find it unnecessary to address Glenda's assertion because we have determined that an equitable division of the property would award Glenda the marketable securities owned by the parties, instead of a lump-sum cash payment to be paid over a period of years.

the farm property from Glenda's parents. Glenda and Reed were able to purchase the farm because of the fact that Glenda is the only child of her parents' marriage. The transfer of the farm property and the transfer of the marketable securities shall be completed on or before March 1, 1981, by proper assignment of the marketable securities and a warranty deed to the real estate. Thus, in two respects, the division of property made by the district court was clearly erroneous. However, the awards of alimony and child support are proper.[4] Under the judgment of the district court, Glenda receives $400.00 per month per child as child support while Reed receives the income tax deductions. Glenda received as alimony the sum of $75,000.00 on July 1, 1979, and will receive $25,000.00 on July 1, 1982.

### III

◼ The final issue raised by Glenda concerns whether or not the district court committed error when it failed to award Glenda attorney fees and adequate expert witness fees during the maintenance of the action. Reed commenced this action on December 27, 1977. In her answer, Glenda requested that the court grant her temporary attorney fees, costs, and expenses, in order to enable her to maintain the action. On December 12, 1978, Glenda presented a motion for temporary alimony, temporary child support, and award of $6,000.00 for attorney fees and $1,500.00 for expert witness fees. In response to Glenda's motion, the trial court awarded a single support payment to Glenda totaling $1,000.00; a single alimony payment totaling $1,500.00; and a single payment for expert witness fees of $1,000.00. The district court reserved its ruling on attorney fees and additional expert witness fees until trial; however, the district court made no award of attorney fees or additional expert witness fees in its decree. Glenda asserts that the district

court abused its discretion when it failed to award Glenda her attorney fees and adequate expert witness fees during the maintenance of the action.

Section 14–05–23, N.D.C.C., provides that a court may issue an order requiring a party to pay support and attorney fees during the pendency of a divorce action. In *Fischer v. Fischer*, 139 N.W.2d 845 (N.D. 1966), we stated that § 14–05–23, N.D.C.C., relates to the ability of the person to prosecute or defend the action at the time of the commencement of the action and that it is not what division of property the court may ultimately make that determines whether a person is entitled to an award of money to prosecute or defend the action. In *Zundel v. Zundel*, 146 N.W.2d 903 (N.D.1966), we stated that the burden of showing that an allowance of attorney fees is necessary to defend an appeal in a divorce action is upon the party seeking the allowance of the fees. Because of the sizable marital estate accumulated by Reed and Glenda, Glenda asserted that it was necessary for her to employ experts in order to value the estate. However, Glenda was able to obtain legal counsel and expert witnesses who agreed to provide services in spite of the fact that they were not paid at the time of this appeal. Glenda has requested that we award her $27,035.61 for attorney fees and $4,489.25 for expert witness fees.

In *Nastrom v. Nastrom*, 284 N.W.2d 576 (N.D.1979), we stated that in making the determination of what part of a wife's attorney fees should be paid by the husband, the trial court should consider the property owned by each party as a result of the property division, their relative incomes, whether or not the wife's property is in liquid or fixed assets, and whether or not the wife's or the husband's actions unreasonably increased the time spent on the case. Although in the usual instance, the district court should award to the wife an

---

4. Glenda contends that she should receive $1,000.00 per month per child for support of the children and $2,000.00 per month for ten years as alimony. Glenda also urges that we direct the district court to add 20% interest to

any awards which are to be paid after the date the judgment was decreed. We decline to make such a direction in view of the distribution of the marketable securities and farm property to Glenda.

allowance for attorney fees in a case which extends over a two-and-a-half-year period, Glenda was not unduly prejudiced by the district court's failure to enter an award under § 14–05–23, N.D.C.C. The record reveals that from May, 1978, through December, 1979, the date of Glenda's motion for attorney fees and expert witness fees, Glenda had an average of $1,168.63 per month available to herself for support. In addition, Glenda retained experts who testified as to the value of the property. On the basis of these facts, the district court could conclude that Glenda was able to defend her interests in the action for divorce. The district court could properly consider the amount of property which each party received as a result of the property division. Because of the substantial portion of the marital estate awarded to both Reed and Glenda, the district court's failure to award Glenda attorney fees was not an abuse of discretion.

For reasons stated in this opinion, the judgment is modified and, as modified, the judgment is affirmed.

ERICKSTAD, C. J., and SAND, J., concur.

VANDE WALLE, Justice, dissenting.

I dissent from the disposition of this case as set forth in the majority opinion. I can accept the conclusion that the distribution of the property by the district court was inequitable because Reed received the assets possessing a high income-producing capacity and consequent tax advantages, whereas Glenda received predominantly cash awards. I cannot, however, agree that Glenda "must" receive all the marketable securities owned by the parties instead of the $200,000 property-settlement award made by the district court. This is a large estate. Perhaps Glenda should receive the marketable securities but, on the other hand, perhaps Glenda should receive a larger cash award or some other income-producing property in lieu thereof. If this court determines the division of property to be inequitable there may be—in some instances, where there is little property to distrib-

ute—only one equitable method of distribution. Where, as here, there is considerable property involved, I cannot conclude this court should redistribute the property. Rather, I believe the case should be remanded with proper directions.

PEDERSON, Justice (dissenting).

Findings of fact are not clearly erroneous merely because this court says so. Justice Paulson has pointed out what the rules are in the opinion he authored for this court in *Haberstroh v. Haberstroh*, 258 N.W.2d 669 (N.D.1977). (1) Findings on property division will not be disturbed unless they are induced by an erroneous view of the law; (2) when there is some evidence supporting the findings but we are nevertheless left with a definite and firm conviction that a mistake has been made, we may set trial court findings aside.

There is no erroneous view of the law pointed out and I have no firm conviction that a mistake was made in this case. I might have viewed the facts differently if I had been the trier of facts but that doesn't permit me to substitute my judgment, as an appellate judge, for that of the trial judge. See *Larson v. Larson*, 234 N.W.2d 861 (N.D. 1975). When it does not appear that we can do any better, we should leave well enough alone. See my dissent in *Haugeberg v. Haugeberg*, 258 N.W.2d 657 (N.D. 1977).