In the Matter of the ESTATE of D. W. ELMER, Deceased.

Lena ELMER et al., Contestants and Respondents,

v.

Jake N. ELMER, Proponent and Appellant,

v.

Lawrence ELMER, Henry Elmer, and Interested Parties, Respondents.

Civ. No. 8873.

Supreme Court of North Dakota.

Aug. 17, 1973.

As Amended on Denial of Rehearing Oct. 8, 1973.

Orville A. Schulz, New Salem, and Thompson, Lundberg & Nodland, Bismarck, for contestants and respondents.

C. J. Schauss, Mandan, and Kurt H. Krauth, Hebron, for proponent and appellant.

VOGEL, Judge.

This is an appeal from a judgment of the district court of Morton County, setting aside a decree of the county court of Morton County which admitted to probate the will of D. W. Elmer, deceased. The judgment of the district court directs that the estate of Elmer be administered under the laws of intestate succession of the State of North Dakota.

The will in question was executed by the deceased on the evening of January 12, 1972. The testator had been brought to the hospital by his brother, Jake Elmer, the appellant, on the previous day, at the request of the testator. It is evident from the record that the testator was a critically ill person when admitted to the hospital. He was suffering from congestive heart failure and from shortness of breath, and was very apprehensive. A dose of seventy-five milligrams of Demerol was administered to him at about 2:50 p. m. on January 12. Demerol is a drug which affects the brain processes, and was prescribed to reduce the apprehension. About 4:30 p. m. of that day, less than two hours after the drug had been administered, and during the period of its greatest effect, the appellant, Jake, whose son was bequeathed the entire estate under the provisions of the will, spoke to the testator alone for about half an hour. Then the appellant left to obtain an attorney to have the will prepared.

Medical testimony discloses that at 4:30 p. m., the drug which had been administered would have been at its maximum in effectiveness, but that in the ordinary person those effects would have worn off to a large extent by the time of the execution of the will that evening, and that the drug would have a more lasting effect on a person in poor physical condition.

The testator had been placed in an oxygen tent at about noon on the 12th of January and the oxygen tent had been removed at some time prior to the execution of the will. Although the testator signed his name in a very legible hand on his admission to the hospital on January 11, he was wholly unable to sign his name to the will at the time of its execution, and executed it merely by making a belabored "X." There also is testimony by the proponents of the will that it had been drawn by the attorney who was called by the appellant, and the attorney was given information as to the provisions to be put into the will by the testator himself. After the execution of the will, the attorney kept the instrument until after the death of Elmer one week later. It was not seen again by the testator after its execution.

About six days prior to the testator's entry into the hospital, he called on his attorney on another matter, but talked about selling the farm or renting it. At that time, he made no mention of drawing a will in favor of his nephew, the son of the appellant. The appellant testified that when he first talked to the decedent on January 12, just prior to the drafting of the will, the decedent had said, "I don't know what to do. What shall I do?" At the time of this conversation, he was under the effects of medication and the appellant was alone with him.

One paragraph of the will provides:

"THIRD: I make no provision for my brothers, Jake N. Elmer, Henry Elmer, nor for my sisters, Lena Elmer, Rachel Martell and Marie Brown, all of whom are financially so fixed that they can well live without any benefits from my estate. . . ."

The record discloses that the brother Henry was eighty-two years of age at that time and was a retired fruit picker living in a retirement home. One of the sisters, Rachel Martel, was a widow seventy-seven years of age, in the process of purchasing a trailer home by installments. Another sister, Marie Brown, was sixty-seven years of age and making her living scrubbing and cleaning buses for a transcontinental bus company. Each had a small amount of

savings, insufficient for support for any prolonged period of time.

There are two main issues to be determined on this appeal, and they are so closely related that they can be considered together: (1) Was D. W. Elmer legally competent to execute a will on the evening of January 12; and (2) Was he at that time under the undue influence of his brother Jake?

Section 30–06–03, North Dakota Century Code, provides that among the issues to be tried and determined by the court, where objections are made to the probate of a will, are:

1. The competency of the decedent to make a last will and testament; and

2. The freedom of the decedent, at the time of the execution of the will, from duress, menace, fraud, or undue influence.

The district court found that at the time the will was executed the appellant, Jake, whose son was the sole beneficiary under the will, was disposed to and did exercise undue influence upon him; that the disposition of the estate as made in the will was unnatural because it excluded the testator's brothers and sisters and all other nieces and nephews and was highly advantageous to the family of the appellant; and that the will as executed was not the free and lawful will of the deceased, but was obtained by the exercise of the undue influence of Jake N. Elmer.

Assuredly, this is a very close case. On the side of the appellant, many persuasive arguments can be made, as the dissent shows. The decedent was a successful farmer, self-reliant during his lifetime. Unless his mind was overpowered by undue influence, he had every right to dispose of his property as he chose. The persons present at the time he signed the will (the attorney and the male nurse, who witnessed the will) and the appellant (who saw him earlier in the day and just before the conference between the decedent and the attorney resulting in the drafting of the will) testified that he knew and understood what he was doing. They indicate that his inability to sign his name, and his use of an "X" instead, was due to a temporary numbness in his right thumb and forefinger.

On the other hand, it appears that the decedent spent about half an hour alone with his brother, the appellant, in the afternoon, and that during this half hour the decedent was admittedly under the influence of Demerol to a high degree. The attending physician (who did not see the patient during the crucial period, but did see him many times during his hospitalization) testified that the patient was critically ill and suffering from congestive heart failure, that this medical problem results in a deficiency of oxygen in the brain which in turn results in a "clouding of clarity" and a reduction of acuity, that he was very apprehensive and had difficulty in breathing, and that a person in such a condition will tend to avoid other problems and take the easy way out. In order to alleviate the apprehension, the physician prescribed Demerol, which reduces the apprehension (but has no effect on the supply of oxygen to the brain), has the further effect of producing euphoria, and reduces likelihood of resistance to suggestion. The physician described "euphoria" as a "lackadaisical, happy-go-lucky, slightly airy feeling."

The trial court concluded from the foregoing that the decedent was highly susceptible to undue influence in the afternoon when he conferred with the appellant, just before the appellant left to get the attorney who subsequently drew the will, about four hours later. By the time the will was drawn and signed, the effect of the Demerol was lessened, but the problem of oxygen supply to the brain continued, and the apprehensiveness presumably returned to some degree. More important, the medical testimony of the attending physician, who was the only expert called by either side, indicates a considerable significance in the numbness of the right hand at the time of the execution of the will. The physician

indicates that the numbness was due to either a stroke, or a spasm of a cerebral blood vessel, occurring at the time of the signing. Upon seeing the signature of the decedent the previous day on an admission record of the hospital, and comparing it with the attempted signature on the will, the doctor said he could "hardly believe they are the signatures of the same individual they are so different," and stated that the person making the second one was in "considerable medical and physical difficulty."

We conclude from this testimony that the trial judge had ample reason to conclude that undue influence affected the signing of the will.

This is not to say that the members of this court, or those who sign this majority opinion, if acting as trial judges, would have arrived at the same decision. This is, as we have said, a close case on the facts.

The legal principles involved are not in dispute. They have been expounded many times, in this State and others. Our decisions include Stormon v. Weiss, 65 N.W.2d 475 (N.D.1954), and In re Burris' Estate, 72 N.W.2d 884 (N.D.1955).

■ The principal holdings in these cases can be briefly summarized. There is a presumption of sanity and testamentary capacity, and the burden of proving lack of capacity is on the contestant. The ultimate question in a challenge of a will on the ground of testamentary capacity is the competency of the decedent at the time of making the will. Nephews, nieces, brothers, and sisters, and all other collateral heirs are not, because of the relationship alone, "natural objects of bounty," as that term is used in the interpretation of wills. A signature to a will made by an "X" is valid, but the circumstances necessitating such a signature, like all the other circumstances of the making of the will, may be considered in determining the question of competency. Where undue influence is alleged to have entered into the making of the will, there may be an inference of susceptibility from domination or confidential relationship by the beneficiary of the proposed will. The ultimate question in such cases is whether the will is the result of undue influence on the mind of the testator at the time of the making of the will.

■ A lengthy annotation at 9 A.L.R.3d 15 discusses the general principles involved here, particularly as applied in cases of alleged addiction or use of alcohol and drugs, including Demerol. Parenthetically, the annotation contains at least six cases where Demerol was the drug in question, and in all of these the will was ultimately upheld, but this is of little value to us in the light of the testimony of the one expert in this case, to the effect that the effects of Demerol are variable in different individuals, and may vary widely depending upon time factors and the method of use, whether by intramuscular injection (used here) or intravenous injection, or orally. The annotation does not state the method of use in the cases cited.

■ While we place great reliance, as we must, on the findings of the trial court [Rule 52(a), N.D.R.Civ.P.], we must also recognize that the cutting edge of that rule is at least dulled by the fact that this case has previously been decided by two trial judges, the county judge who heard it in the first instance and the district judge who heard it de novo without a jury in the second instance, and that the first upheld the will and the latter denied it probate. While we do not have a record of the proceedings in the county court, we have heard from one of counsel that the testimony was similar in both courts.

Nevertheless, we are bound by Rule 52(a). We are bound by it, whether we consider the decision of the lower court as conclusive upon us as to issues of fact as a jury verdict is, or whether we are bound by a slightly less severe standard, as the dissent urged in Kleinjan v. Knutson, 207 N.W.2d 247 (N.D.1973).

**820**

When we adopted Rule 52 from the Federal Rules of Civil Procedure, we did so with knowledge of the interpretations placed on it by the Federal courts. Although we are not compelled to follow those interpretations, they are highly persuasive and, in the interest of uniform interpretation, we should be guided by them.

A finding is "clearly erroneous" only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). The mere fact that the appellate court might have viewed the facts differently, if we had been the initial trier of the case, does not entitle us to reverse the lower court. Nee v. Linwood Securities Co., 174 F.2d 434 (8th Cir. 1949); Wright & Miller, Federal Rules of Civil Procedure, Sec. 2585, p. 729 et seq.

In a case like this one, where the determination must ultimately be made in large part upon an evaluation of the credibility of the witnesses, we must be especially alert to the admonition of Rule 52(a) that—

". . . due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Here, the trial judge has determined, in his memorandum opinion, that the testimony of one witness, the appellant himself, is not to be given full credit. The testimony of that witness is of crucial importance. We will not say that this determination, or the decision of the trial judge on the merits, is "clearly erroneous." Our function is not to decide factual issues de novo. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

This is, as we have indicated, a case where the decision might have gone either way. Where this is true, it neces-sarily follows that a decision either one way or the other cannot be "clearly erroneous."

"Such a choice between two permissible views of the weight of evidence is not 'clearly erroneous.'" United States v. Yellow Cab Co., 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949).

It is also true that it is the findings of the trial court which we must adhere to unless clearly erroneous, and not the conclusions of law or the ultimate decision made upon the basis of those findings. See Moore's Federal Practice, Sec. 52.-05(1) and cases cited. But here, the trial court made exhaustive findings of fact, and related the factual basis for each. We are satisfied that the record supports the findings, and that the findings made compel the result ordered by the lower court. While other findings, compelling a different result, could have been made from the same evidence, they were not made here.

The findings made include all the essentials for a finding of undue influence as set out in In re Burris' Estate, *supra*: the opportunity to exercise undue influence, the disposition to exercise it, the susceptibility of the decedent to the exercise of undue influence, and that the result appears to be the effect of undue influence.

The judgment of the trial court therefore is affirmed.

PER CURIAM.

VOGEL, J., was not a member of the court at the time of oral argument, but participated on the briefs. The foregoing opinion includes a summary of facts prepared by ALVIN C. STRUTZ, Chief Justice, before his death, and many of the cited authorities were collected by him. Coincidentally, the same situation occurred in our leading case of Stormon v. Weiss, N.D., 65 N.W.2d 475. See Note 1, p. 479.

ERICKSTAD, C. J., and KNUDSON and PAULSON, JJ., concur.

TEIGEN, Judge (dissenting).

I dissent. I fully realize that under Rule 52(a), N.D.R.Civ.P., we are bound by the so-called "clearly erroneous" rule in reviewing findings of fact of the trial court. I also agree that the mere fact that this court might have viewed the facts differently had it been the initial trier of the case does not entitle us, under that rule, to reverse the lower court. However, on the entire evidence, where the reviewing court is left with a definite and firm conviction that a mistake was made by the trial court, it has a duty to reverse the lower court. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). ·In this case I am firmly of that conviction, and therefore believe that the majority have erred.

As noted by the majority, this case has been tried twice. They were both complete trials, one in the county court and the other on appeal de novo in the district court. It is agreed that the testimony was similar in both trials. Each of the judges of these courts is a good and qualified judge, learned in the law. However, they arrived at opposite conclusions. The judge of the county court found that the testator, D. W. Elmer, was competent and that the will was not executed as the result of undue influence. He therefore admitted the will to probate. The judge of the district court made no finding on the question of competency, but determined that the will was obtained and was the result of the exercise of undue influence, and adjudged that it was invalid and not entitled to probate. Both found that the will was legally executed. After a careful study of the entire evidence I am left with a definite and firm conviction that the judge of the district court made a mistake, and that he should have affirmed the county judge's decision.

D. W. Elmer, at the time of the execution of the will in question, was seventy-three years of age. He was a single man. All his life he had resided on the home farm in the vicinity of Hebron, North Da-

kota. He lived there with his sister, Lena, also single, who was sixty-eight years of age. They had inherited this 1200-acre farm, together with all the personal property located thereon, from their parents, and owned it in common. In addition, they had accumulated a bank account, amounting to about $42,000, which was held in joint tenancy with the right of survivorship. It had been a successful operation, and nowhere in the evidence is it indicated that D. W. Elmer had relied upon his brother, Jake, in any way before January 11, 1972. In addition to his sister, Lena, and his brother, Jake, aged seventy, D. W. also had a brother, Henry, aged eighty-four, a sister, Rachel, aged eighty, and a sister, Marie, aged sixty-seven. Although D. W. and Lena had inherited the farm from their father, together with the personal property located thereon, the father, during his lifetime, had made a gift of separate farms to each of D. W.'s brothers, Henry and Jake. In addition, he had made gifts of $3,000 to each of the children.

Although Henry is living in a retirement home in California, there is no proof that he is poor. He had sold his farm in North Dakota and moved to California. He owned his home there, where his wife was living at the time of trial. Lena Elmer, of course, is financially well-fixed. The two sisters, Rachel and Marie, left home years ago and have had no relationship with D. W. for years.

On January 11, 1972, D. W. telephoned his brother Jake and requested a ride to the hospital at Richardton because he was ill. Jake first took him to the hospital, as requested, and then, at the request of the hospital authorities, he was taken to the office of Dr. Neville Jones. Dr. Jones diagnosed congestive heart failure, and directed that D. W. be hospitalized. Jake then returned D. W. to the hospital, and then went home.

The doctor ordered that D. W. be treated with bed rest and placed on a low salt diet. He ordered oxygen for him at inter-

mittent periods, as needed, and prescribed three drugs. These drugs did not affect the patient's mental processes.

The doctor testified that, on the following day, January 12, 1972, he found his patient to be clear and coherent; he answered questions rationally and without difficulty, but showed a certain amount of apprehension which, he testified, occurs frequently in people suffering from congestive heart failure. The doctor then prescribed morphine sulfate, with instructions that it could be repeated every six hours, if necessary, at the discretion of the registered nurse on duty. He gave permission to substitute Demerol. The doctor testified that each of these drugs exert virtually the same medicinal effect. Both are narcotics.

Demerol was muscularly injected at 2:50 p. m., on January 12. The dosage was seventy-five milligrams, which, according to the doctor, for a person of D. W.'s size and physical condition, was classified as a moderate dose. The effects were described as being hypnotic and having a direct effect upon the brain of the patient, making things a little more pleasant for him and producing euphoria. He described this as giving the patient a "lackadaisical, happy-go-lucky, slightly airy feeling." The effect of the drug would commence about twenty to thirty minutes after injection, reaching maximum intensity perhaps forty-five minutes to one hour after injection, and then gradually diminishing. He testified that its main effects would have worn off in about four hours but that there might be some residual effect for a further two hours, or a total period of about six hours. No further Demerol was administered until January 14.

The doctor also saw his patient on the morning of January 13, 1972. He found his condition improved and his color good. He testified that he looked better and felt better. His patient indicated no inability to talk to him rationally or to discuss his situation on that day, and continued to show day-to-day improvement until January 14.

D. W.'s attending physician testified that, in his opinion, D. W. was a perfectly sane man, although he was distressed and apprehensive. He testified that on January 14 he noted some sagging in his patient's face and that the hospital record disclosed that on January 12 the patient had complained that the thumb and first finger of his right hand felt numb. This indicated to the doctor an interference with the blood supply in the nerve area of the brain which controls the arm and hand, and he concluded, on January 14, that the numbness was the onset of a stroke, which was the ultimate cause of his death on January 19.

The evidence establishes that at about 2 p. m. on January 12, D. W. asked a nurse to telephone his brother Jake to come and see him. In response, Jake came to see D. W. at the hospital at about 4:30 p. m. and, according to Jake's testimony and the hospital records, he stayed and visited with his brother for a period of twenty-five to thirty minutes. Unquestionably, at this time, the effect of the Demerol was at or near its maximum, and it was during this visit, the contestants claim and the trial court found, that Jake exercised undue influence upon his brother. Three hours elapsed before Jake returned with Attorney Kurt H. Krauth.

Mr. Krauth has practiced law in Hebron since 1934. He had done legal work for D. W. Elmer, on occasion, "probably once a year over a period of about twenty years." He had done no legal work for Jake Elmer.

D. W. Elmer had been in Kurt Krauth's office in Hebron on January 5, 1972, for the purpose of having him complete a Social Security tax reporting form. On that occasion, D. W. had mentioned to Mr. Krauth that, because of his advanced age and because he hadn't been feeling too well, he ought to make some provision for the disposition of his property, and stated that he had in mind giving his property to

his nephew, Lawrence Elmer. This conversation did not go beyond the discussion stage.

Mr. Krauth testified that on arriving at the hospital on January 12 he asked Jake Elmer and his son Lawrence, who had accompanied them, to leave the room as he did not want them present if he was going to discuss with D. W. the making of a will. He testified that after the two men had left the room, and in his discussion with D. W. relative to making a will, he recalled the incident of January 5 and asked D. W. if he still had the same intention, and was told by D. W. that it was his desire to leave all his property to his nephew Lawrence. Mr. Krauth took notes of this conversation, which notes were introduced in evidence. Mr. Krauth testified that, in his opinion, D. W. Elmer was rational and normal, that he gave answers to all questions which were asked, and that his mind appeared to be perfectly clear. He also testified that after he had obtained the information necessary for drawing the will he obtained a table upon which to place a typewriter, which he had brought with him. He then typed the will in accordance with his notes. When the will had been prepared he went back into D. W.'s hospital room and read the will to him, word for word; that D. W. agreed that the will was drawn in accordance with his wishes. Mr. Krauth then went into the hallway and obtained a second witness to the will. This second witness was Gayle Heinsen, a male nurse who is employed at the hospital and who is in charge of nurses. Following the necessary legal preliminaries, Mr. Krauth handed D. W. a felt-tipped pen with which to sign the will. However, D. W. was unable to sign the will because of a numbness in his right thumb and forefinger. Mr. Krauth then suggested that he sign by affixing thereto his mark in the form of an "X". This was done, and the will was witnessed by Mr. Krauth and Mr. Heinsen in accordance with the procedure required for the execution of wills. Mr.

Krauth then folded the will, put it into an envelope, and kept it in his possession.

Mr. Heinsen confirms the execution of the will in accordance with the explanation made by Mr. Krauth. He also testified that at the time of the execution of the will Mr. Elmer appeared to him to be coherent and rational; that he had no reason to believe that D. W. was not in control of his senses; that he knew what was going on and understood what he was doing. The will was executed at about 8 p. m. Mr. Heinsen knew that D. W. had been administered seventy-five milligrams of Demerol at about 2:50 that afternoon, but stated that D. W. did not appear to be under the influence of the drug at the time of the execution of the will. He testified that it was his opinion that D. W. had testamentary capacity, as that term had been described to him by counsel on cross-examination.

There is much evidence that D. W. Elmer was a man of strong will and character. He was a successful farmer and managed his own business and, although he had inherited substantial property, he had, in addition, accumulated substantial additional properties and money. There is no contention on the part of any witness that at any time prior to D. W.'s admission to the hospital, he was incompetent or a person susceptible to influence. In fact, D. W. initiated the action which resulted in the will being drawn and executed when he directed the nurse to telephone his brother to come and see him. There is no evidence which would indicate that he did not also direct the chain of events which followed. The testimony of the doctor, of the nurse in attendance, and of the attorney who drew the will indicate that, except for his apprehension, D. W. was normal mentally. According to the doctor the effect of the drug Demerol, administered over five hours before the execution of the will, had but a residual effect. There is no evidence which would permit the presumption that diminution of the blood supply to the

brain, causing the numbness of the forefinger and thumb of his right hand, had any effect upon his mental processes.

Further, there was no unusual opportunity on the part of Jake to exercise undue influence upon his brother. He came to the hospital as a result of his brother's call at about 4:30 p. m. He remained there for a period estimated to be from twenty-five to thirty minutes, after which he left to carry out his brother's request. There was another patient in the room, separated from D. W. by a curtain.

There is no evidence that at any other time prior thereto had D. W. consulted with his brother relative to any business matters. There is no evidence that a confidential relationship existed between D. W. and his brother Jake. I find no evidence that there was any unusual opportunity on the part of Jake to exercise undue influence upon his brother. There are no facts upon which an inference or presumption of an opportunity to exercise undue influence existed under these conditions. The disposition to Lawrence is not unnatural as it is clear from the evidence that D. W. had a strong bond of affection for his nephew Lawrence, who had worked for him on the farm a good part of his life, ever since he was ten years old.

There is no direct evidence that undue influence was exercised by Jake upon D. W., nor is there any evidence, nor are there any circumstances, which would indicate that D. W., after the execution of the will, indicated by word or action that he had been subject to undue influence, or that he was dissatisfied with the will, although, according to the doctor, his condition had improved the next couple of days. The congestive heart condition did not cause his death. Death, caused by a stroke, occurred seven days later.

Every person of sound mind and memory has the constitutional and legal right to dispose of his property by will in any manner that he may choose. It is a sacred right which the courts are duty-bound to respect and protect. In this case it is my opinion that the contestants have wholly failed to produce any evidence, either direct or circumstantial, to prove the four elements which are necessary prerequisites for establishing undue influence. For these reasons, I would reverse the judgment of the district court, with directions to enter a judgment affirming the decree of the county court admitting the will to probate.