Lyle  James  DAVIS,  Plaintiff-Appellant,

v.

Paula  Catherine  DAVIS,
Defendant-Appellee.

Civ. No. 9473.

Supreme Court of North Dakota.

July 13, 1978.

Pearson & Christensen, Grand Forks, for plaintiff and appellant; argued by Garry A. Pearson, Grand Forks.

Shaft, McConn & Fisher, Grand Forks, for defendant and appellee; argued by Patrick W. Fisher, Grand Forks.

PAULSON, Justice.

The plaintiff, Lyle James Davis [hereinafter Lyle], and the defendant, Paula Catherine Davis [hereinafter Paula], were married in Grand Forks on July 23, 1972. Paula had previously been married and divorced. There were two children born as the issue of her first marriage, namely, Rachel Ann, born March 4, 1970, and Mary Carolyn, born July 7, 1971, both of whom were adopted by Lyle in 1975. Two children were born as issue of their marriage, namely, Michael James Davis, born October 28, 1973, and Patrick Lyle Davis, born September 9, 1975.

Lyle commenced this divorce action in November of 1976, alleging irreconcilable differences. On November 24, 1976 Paula answered, denying the allegations of the complaint and requesting a dismissal of the

action. On March 30, 1977, pursuant to the stipulation of the parties, Paula amended her answer and also counterclaimed, alleging adultery, and praying for a divorce, custody of the four children, child support, alimony, and an equitable division of the property. The action was tried to the court on September 1 and 2, 1977, and judgment was entered on November 15, 1977. Thereafter Lyle moved for a new trial and, after a hearing, the court, on February 2, 1978, entered an order denying a new trial.

Lyle appealed from the judgment and from the order denying a new trial. The court granted a divorce to Paula on the ground of adultery. The district court awarded the following property to Paula: (1) the homestead, subject to the mortgage; (2) the personal property therein; (3) the custody of the four minor children; (4) child support in the sum of $200.00 per month for each child; (5) alimony in the sum of $1,600.00 per month; (6) her personal checking account; and (7) the sum of $80,000.00 as a cash settlement, which sum was divided as follows: $10,000.00 payable to Paula within 90 days after the date of the judgment, the remaining balance of $70,000.00, plus interest, payable in thirty-six equal monthly installments with interest at the rate of 7 percent on the unpaid balance, the first payment to commence October 1, 1982, except that the annual interest payments in the amount of $4,900.00 per year shall be paid on or before 30 days following each anniversary date of the judgment, commencing in 1978 and continuing in 1979, 1980, and 1981, and through September 30, 1982. The interest payments were to be in addition to other child support and alimony.

The court awarded to Lyle the following property: (1) all of his stock in Davis Jewelry, Inc.; (2) the Trepanier building; (3) all bank accounts presently in his name; (4) all other stock presently owned by him; (5) all personal property presently in his possession; and (6) the residence at Manvel, North Dakota, subject to indebtedness.

Lyle has appealed from that part of the divorce judgment in which the trial court divided the parties' property, and awarded alimony and attorney fees.

█ We are first confronted with the question of whether or not Lyle's motion for a new trial, based solely upon newly discovered evidence, which motion was denied by the district court, limits Lyle's appeal to this single issue. When a party appeals from an order denying a new trial, the review in this court is limited to those grounds which were presented to the district court. However, when there is an appeal from the judgment, the appeal is not limited to those issues raised in a motion for a new trial. All issues which were properly preserved at the trial and raised on appeal are reviewable.

We shall now discuss the issues presented to this court, which are as follows:

(1) Whether or not the trial court's distribution of property and the award of alimony were clearly erroneous.

(2) Whether or not the trial court committed reversible error in its application of the law concerning the distribution of property under the divorce decree to the children.

(3) Did the trial court err in finding that the appellee did not have sufficient moneys to pay her attorney fees and that the amount of $2,853.70 was reasonable?

Lyle requests this court to reverse the trial court's award to Paula of $1,600.00 per month alimony and also the property award to Paula of $80,000.00. Lyle also requests this court to reduce the attorney fees which the trial court awarded to Paula's attorney. However, Lyle does not contest the ground upon which Paula was granted a divorce. Nor does he appeal the award of custody of the four minor children to Paula, the award of $200.00 monthly support payments for each of the minor children during their respective minorities, or the award to Paula of the Belmont home, together with its furnishings.

█ The court has adopted the rule that the review of the judgment on appeal is limited to whether or not the findings of

fact are clearly erroneous within the provisions of Rule 52(a) of the North Dakota Rules of Civil Procedure, and, thus, we will not set aside those findings unless they are clearly erroneous. This court stated in *Haugeberg v. Haugeberg*, 258 N.W.2d 657, 659 (N.D.1977):

> "A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *Kostelecky v. Kostelecky, supra* 251 N.W.2d 400 (N.D.1977); *Rambel v. Rambel*, 248 N.W.2d 856 (N.D. 1977); *In re Estate of Elmer*, 210 N.W.2d 815 (N.D.1973)."

The trial court's determinations on matters of child support, alimony, and division of property are treated as findings of fact, and our review of such matters on appeal is limited by Rule 52(a), N.D.R.Civ.P. *Haugeberg, supra.*

In determining whether the trial court erred in dividing the property between Lyle and Paula, we are governed by the provisions of § 14–05–24, of the North Dakota Century Code, which grants to a district court in a divorce action the power to make such an equitable distribution of the real and personal property as may seem just and proper. Section 14–05–24, N.D.C.C., provides as follows:

> "14–05–24. *Permanent alimony—Division of property.*—When a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper, and may compel either of the parties to provide for the maintenance of the children of the marriage, and to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively. The court from time to time may modify its orders in these respects."

This court must also give consideration to § 14–05–25, N.D.C.C., which provides:

> "14–05–25. *Security for alimony—Disposition of homestead.*—The court may require either party to give reasonable security for providing maintenance or making any payments required under the provisions of this chapter, and may enforce the same by appointment of a receiver or by any other remedy applicable to the case. When the wife has a separate estate sufficient to give her a proper support, the court in its discretion may withhold any allowance to her out of the separate property of the husband. The court, in rendering the decree of divorce, may assign the homestead or such part thereof as to the court may seem just, to the innocent party, either absolutely or for a limited period, according to the facts in the case and in consonance with the law relating to homesteads. The disposition of the homestead by the court, and all orders and decrees touching the alimony and maintenance of either party to a marriage and for the custody, education, and support of the children are subject to revision on appeal in all particulars, including those which are stated to be in the discretion of the court."

Lyle urges that the award of alimony in the sum of $19,200.00 per year during Paula's lifetime or until she remarries is unrealistic and exorbitant, in comparison with the property which was awarded to him, and, specifically, places an unusual financial burden upon him in view of his financial condition, as shown by the evidence adduced in support thereof. Lyle testified that he commenced his employment during the Fall of 1971 with Davis Jewelry, Inc. (a close corporation) owned by his father and mother. Prior to that time he was employed by other persons outside the State of North Dakota. The jewelry store was founded by Roy Davis, Lyle's father, in 1937, and was owned and operated by Roy Davis and his wife as majority stockholders until August 1, 1977. Lyle purchased the majority stock owned by Roy Davis (323 shares) and by Vonnie Davis (10 shares).

On December 31, 1976, Davis Jewelry, Inc., a Subchapter S corporation, had a total of 509 shares, which were owned as follows:

| | |
|---|---:|
| Roy Davis | 323 |
| Vonnie Davis | 10 |
| Lyle Davis | 176 |
| | 509 |

Lyle acquired his shares as follows:

| | |
|---|---:|
| December 24, 1970 | 10 |
| December 30, 1971 | 43 |
| December 31, 1972 | 35 |
| December 31, 1974 | 88 |

During the years of his marriage, Lyle's salary was paid on a weekly basis, as follows: in 1972, $200.00; in 1973, $250.00; in 1974, $250.00; in 1975, $300.00; and in 1976, $350.00. Davis Jewelry, Inc., at the end of each year, paid either a bonus or a dividend on Lyle's shares of stock, as well as on the shares owned by Roy and Vonnie Davis. Lyle's dividend income was returned to the corporation in order to pay for his shares of stock, as well as for his state and federal income taxes. Lyle further testified that Paula and he lived on the salary which he received. The house on Belmont Road was purchased in the Spring of 1973 for the sum of $32,900.00. The down payment of 20 percent, or $6,580.00, was made from Lyle's savings account. Lyle also acquired, prior to his marriage, a one-half interest in the Trepanier building in which the Davis Jewelry, Inc. store is located. The building was leased to the jewelry store at a rental of $2,000.00 per month. The rental income was subject to payments for taxes, insurance, maintenance, and depreciation. In 1974 Lyle purchased the remaining one-half interest in the Trepanier building from his brother, Wayne Davis. Lyle then, on August 1, 1977 redeemed the 323 shares of stock from his father and the 10 shares of stock from his mother. Lyle financed the stock purchases through a Small Business Administration loan in the sum of $271,000.00, which was distributed as follows:

| | |
|---|---:|
| Roy and Vonnie Davis, for their shares of stock | $210,000.00 |
| Additional loan repayment to Roy Davis | 40,000.00 |
| Payment of balance on Trepanier building | 14,000.00 |
| Repayment on a loan from Wayne Davis | 7,000.00 |

The payments on the SBA loan are in the form of monthly payments of $5,700.00, which payments commenced on September 1, 1977, and continue on a monthly basis for five years with interest at the rate of 9½ percent. As a prerequisite for making the loan, SBA prescribed certain conditions, which are herein set forth in pertinent part:

(1) Lyle's salary was limited to $25,000.00 per year during the life of the loan.

(2) Davis Jewelry, Inc., was prohibited from paying any dividends until the loan was paid in full.

(3) The rental payments to Lyle were to be held in abeyance until the SBA monthly payments and all other corporate bills had been paid.

Prior to securing the loan (which is also individually guaranteed by Lyle), Lyle was required to submit a financial statement. The statement shows a total net worth of $243,000.00. A further detailing of this statement reveals:

| | |
|---|---:|
| (a) Real estate, Trepanier building | $143,000.00 |
| (b) Davis Jewelry, Inc., stock | 140,000.00 |
| | $283,000.00 |
| Less Lyle's indebtedness to Roy | 40,000.00 |
| Net worth | $243,000.00 |

Lyle urges that the cost value of the real estate, that is, $143,000, is not the market value and he testified that the value of the building was $75,000.00 and the full market value for assessment for tax purposes was $99,000.00. The building is located at the corner of Third Avenue and De Mers and is located in one of the older sections of the Grand Forks business district.

Lyle further testified that Davis Jewelry, Inc., showed profits for the years 1973 through August 1, 1977 as follows:

| | |
|---|---:|
| 1973 | $33,315.00 |
| 1974 | 50,256.00 |
| 1975 | 98,826.00 |
| 1976 | 118,439.00 |
| 1977 | 33,633.00 |

The reduction of profits in 1977 was the result of declining farm prices and because jewelry is a luxury item. Lyle also purchased a home at Manvel, North Dakota, for the sum of $29,000.00, with a 20 percent

downpayment and the balance payable in monthly installments.

Lyle further contends that the district court erred in finding that the value of the jewelry stock was $295,394.00, and Lyle further asserts that the actual value of the stock was $105,894.00; and further urges that the court deducted only the sum of $28,500.00 (5 monthly payments to the SBA in 1977). Such deduction was made in accordance with principles of accounting, as testified to by Dale Erickson, the certified public accountant.

In order to comprehend the rather involved financial structure of Davis Jewelry, Inc., it is necessary to examine its balance sheet as of August 1, 1977, which is a part of the record and is herein set forth:

DAVIS JEWELRY
BALANCE SHEET
August 1, 1977

ASSETS

| | | |
|---|---:|---:|
| Current Assets: | | |
| Cash | $ 40,076.00 | |
| Receivables – Trade | 24,327.00 | |
| Less Allowance for Doubtful Accts. | (3,265.00) | |
| Inventory | 290,699.00 | |
| Accts. Rec – Roy | 7,500.00 | |
| Accts. Rec – Lyle | ~~53,000.00~~ | |
| Prepaid Expenses | 400.00 | $412,737.00 |
| | | |
| Property & Equipment, at cost: | | |
| Depreciable Assets | $ 46,691.00 | |
| Less – Accumulated Depr. | (39,566.00) | 7,125.00 |
| | | |
| Other assets: | | |
| Investment in RJO | $ 900.00 | |
| Organization Expense | 200.00 | 1,100.00 |
| | | $420,962.00 |

LIABILITIES AND STOCKHOLDERS' INVESTMENT

| | | |
|---|---:|---:|
| Current Liabilities: | | |
| Accounts Payable – Trade | $ 25,818.00 | |
| – Other | 12,994.00 | |
| Accrued Payroll Taxes | 2,110.00 | |
| Sales Taxes Payable | 1,265.00 | |
| State Income Taxes Payable | 1,881.00 | 44,068.00 |
| Notes Payable – Long Term | 271,000.00 | $315,068.00 |
| | | |
| Stockholders' Investment: | | |
| Common Stock, $100 par | $ 17,600.00 | |
| (176 shares authorized and issued) | | |
| Deduct Treasury Stock | (176,700.00) | |
| Retained Earnings | 63,873.00 | |
| Shareholders Undistributed Income | ~~172,414.00~~ | |
| Net Income Year to Date | 28,707.00 | $105,894.00 |
| | | $420,962.00 |

It is also necessary to set forth a resume of the inventory and other important financial data, which is as follows:

| Year: | 1976 | 1975 | 1974 | 1973 | 1972 | 1977 as of 7–31 |
|---|---|---|---|---|---|---|
| Inventories: | $236,042 | $226,598 | $210,411 | $195,507 | $151,545 | $290,699 |
| Shareholder's Undistributed Taxable Income: | $243,674 | $155,708 | $ 79,720 | $ 29,397 | $ 29,609 | $172,414 |
| Total Assets: | $423,534 | $390,655 | $330,364 | $308,848 | $243,392 | $420,962 |
| Total Current Liabilities: | $ 65,087 | $120,174 | $135,871 | $164,678 | $ 99,010 | $ 44,068.00 * |

* Plus $271,000.00 current liabilities.

The district court in its memorandum decision arrived at a valuation of Lyle's assets and determined the valuation from the testimony and the exhibits. A review of the exhibit, that is, the balance sheet of August 1, 1977, shows that $105,894.00 is the value of the business based upon Lyle's accounting procedure. The balance sheet does not consider the factors enumerated by Dale Erickson, the certified public accountant, who testified at length concerning the valuation of the stock. His testimony is unrefuted.

A further perusal of the balance sheet does not reveal the sum of $28,500.00 as being deducted, but it does show that the loan of $271,000.00 from the SBA was included as a liability. Furthermore, there could be no deduction of the $28,500.00 for the payments on the SBA loan on August 1, 1977, as that was the date on which the loan was completed and the first loan payment commenced on September 1, 1977.

In addition, a review of the resume reveals two important factors: (1) a dramatic increase in the inventory from December 31, 1976, to July 31, 1977, in the sum of $64,000.00; and (2) a corresponding decrease in the total current liabilities of the corporation from December 31, 1976, to July 31, 1977, in the sum of nearly $20,000.00 being exclusive of the SBA loan.

■ The evaluation of stock in a close corporation is an intricate process. The record reveals that an in-depth evaluation of the corporation in the instant case was made by Dale Erickson, the certified public accountant. The criteria which are important in such evaluation are: (1) the earnings of the business (sales volume being the ultimate test); (2) good will; (3) previous records of sales of merchandise; (4) weighted average of earnings per share. After considering all of these factors, the certified public accountant, Mr. Erickson, valued the business at a figure between $302,000.00 and $339,000.00. The court, after hearing Mr. Erickson's testimony, together with reviewing the other business records, found that the corporate stock had a value of $295,000.00. The findings of fact of a district court in determining the property division in a divorce action will not be set aside on appeal unless they are clearly erroneous. We do not find the determination of the division of property clearly erroneous.

Lyle strenuously urges that the district court's award of alimony is inequitable and he requests the court to reduce the alimony because it is excessive; that the trial court erred in finding that Lyle had an assured income of $61,375.00 per year, which is as follows:

| | |
|---|---|
| Personal income ($25,000.00, salary plus $24,000.00 rentals) | $49,000.00 |
| Less building expense, based on 1976 | 5,625.00 |
| | $43,375.00 |
| Income to August 1, 1977 (balance sheet) | 28,000.00 |
| | $61,375.00 |

In addition to the property division, Paula was awarded alimony of $1,600.00 per month; $800.00 per month for child support ($200.00 for each child); together with the sum of $80,000.00 ($10,000.00 to be paid within 90 days after the judgment and the

remaining $70,000.00 to be paid in monthly installments commencing in 1982 after the payment in full of the $271,000.00 SBA loan); and Paula was to receive interest at the rate of 7 percent per year ($4,900.00) on the $70,000.00 deferred payment, aggregating a total yearly income of $33,700.00. Paula's monthly expenses are as follows:

| | | |
|---|---|---|
| Groceries | $350.00 | |
| Milk | 50.00 | |
| Household utilities | 250.00 | |
| Miscellaneous household repairs & maintenance | 50.00 | |
| Church contributions & gifts | 25.00 | |
| Car expense | 80.00 | |
| Clothing for Paula & children | 200.00 | |
| Family entertainment | 75.00 | |
| Paula's individual entertainment | 50.00 | |
| Babysitting | 50.00 | |
| Hobbies & toys | 40.00 | |
| Children's activities (swimming lessons, birthday parties, etc.) | 30.00 | |
| Replacement of household appliances, furniture, carpeting, etc. | 50.00 | |
| School expenses (includes school lunches) | 50.00 | |
| Miscellaneous children's activities | 50.00 | |
| Dental expense, Paula & children | 10.00 | |
| Insurance | | |
| House insurance (estimate) | 25.00 | |
| Car insurance | 12.00 | |
| Blue Cross-Blue Shield | 80.00 | |
| House payment | 325.00 | $1,852.00 |

A review of these amounts show that the amounts allocated to the children could be as follows:

| | | |
|---|---|---|
| Groceries and milk | $300.00 | |
| Household utilities | 200.00 | |
| Clothing | 160.00 | |
| Entertainment for children | 75.00 | |
| Hobbies & toys | 40.00 | |
| School expenses & activities | 80.00 | |
| Dental and medical expenses | 80.00 | $935.00 |

This would leave Paula with a total estimated monthly expenditure of $935.00. According to Paula's own estimate, her total monthly expenses (including those of the children) are $1,852.00. If we deduct the $800.00 monthly child support payment which she receives from her estimated monthly expenses, there remain estimated expenses of $1,052.00 per month which Paula must pay from her own resources.

Lyle further urges that since the marriage was of relatively short duration, this factor should have been given consideration by the court in determining alimony. Lyle did not detail his living expenses. However, his income from year to year is not assured, but is entirely dependent upon economic conditions existing in Grand Forks and its surrounding area, his expertise, and his ability to maintain sales and profit margins at least equal to or greater than previous sales because of the impact of inflation, merchandise costs, salaries, taxes, and other business expenses. Lyle is neither entitled to receive any rental months from his Trepanier building until the SBA payments plus all other corporate bills have been paid each year, nor can he receive any bonuses or dividends from the corporation until the SBA loan is paid in full. Accordingly, Lyle is limited to a salary of $25,000.00 per year and a rental income of $24,000.00 per year. We are not unmindful of the fact that Lyle is still obligated to pay taxes, insurance, repairs, and maintenance on the Trepanier building, whether or not he receives any income. The building, of course, is subject to depreciation each year and the expenses, other than depreciation, in the year 1974 were $9,876.00; in 1975, $7,364.00; and in 1976, $5,625.00. His income is also subject to state and federal income taxes. Lyle, in addition, is of course subject to the usual expenditures for his own food, clothing, medical, and housing expenses.

In *Hertz v. Hertz,* 229 N.W.2d 42, 45 (Minn.1975), the Minnesota Supreme Court, in considering a Subchapter S corporation, stated:

"A closely held Subchapter S corporation, such as Hertz Manufacturing, bears characteristics of both a corporation and a proprietorship. As with a proprietorship, defendant is legally entitled to withdraw excess funds from the business to the extent that he deems necessary or

proper. Also as with a proprietorship, it may well be that it will become necessary to retain a share of future net income for business capital purposes. A trial court should, therefore, take this factor into consideration in determining the amount of income that could reasonably be available to defendant in future years."

In *Hertz, supra,* the owner of the corporation did not offer any evidence to indicate the amount of future retention of funds which might be necessary in the business. In the instant case evidence was offered concerning the future earnings of the corporation which would affect its profits. The trial court did not give much consideration to such evidence. The evidence should have been given greater weight.

Paula's income is summarized as follows: $19,200.00 per year alimony payments; $9,600.00 per year for child support payments, together with interest at the rate of 7 percent on the $70,000.00 deferred property settlement (or $4,900.00) until the SBA loan is repaid, which aggregates a yearly income of $33,700.00. Paula's income is subject to monthly expenses for her children and herself totaling $1,852.00. Her alimony and interest received is subject to federal and state income taxes. In contrast Lyle has an income consisting of $25,000.00 per year, plus $24,000.00 probable rental income (subject to expenses averaging $7,500.00 per year), leaving him an income of approximately $41,500.00 per year. From this income, Lyle is obligated to pay Paula $19,200.00 yearly alimony, annual child support of $9,600.00, and interest of $4,900.00 annually, totaling $33,700.00. Lyle then has a remaining income of $7,800.00 (assuming that the $24,000.00 annual rental is paid subject to the restrictions imposed under the SBA loan). His income is subject to federal and state taxes, as well as his personal living expenses.

As stated, the court must take into account the maintenance of a divorced father. *Larson v. Larson,* 234 N.W.2d 861 (N.D.1975); *Hoster v. Hoster,* 216 N.W.2d 698 (N.D.1974). This court in *Larson, supra,* quoted with approval from *Hoster, supra,* ¶ 2 of the syllabus, which held:

"2. In determining the amount a divorced father should pay for support of a minor child and alimony to a former wife, the court must be mindful not only of the needs of the child and of the former wife, but of the divorced father; and while he should support the child and pay alimony as best he can, he should not be burdened to the extent that all incentive is to be destroyed but some balance must be found between the needs of the child, the former wife, and the father's ability to pay."

After carefully considering all of the evidence in the record, we believe that the finding of fact with reference to the alimony is clearly erroneous. We conclude that the interests of Paula and Lyle can best be served by modifying the divorce decree so that the alimony is reduced from $1,600.00 per month to $1,200.00 per month.

Lyle further contends that the trial court erred in its finding which awarded property to the minor children of the parties. As a part of such finding, the court required that Lyle pay from his income $10,000.00 to each of the minor children, that Paula act as trustee, and that, as trustee, she would be governed by the trust laws of the State of North Dakota. This provision is incorporated in the decree of divorce and is to operate as a trust agreement for his children, and any sums remaining are to be payable to them upon each attaining the age of twenty-two years. As previously stated, § 14–05–24, N.D.C.C., provides that the court "may compel either of the parties to provide for the maintenance of the children of the marriage". Section 14–05–25, N.D.C.C., provides that the court "may require either party to give reasonable security for providing maintenance or making any payments required under the provisions of this chapter, and may enforce the same by appointment of a receiver or by any other remedy applicable to the case".

In the instant case the trial court created the trust which provided that certain moneys be held in trust for the respective educational benefit of each of the children and

that the trust would be administered in accordance with the laws governing trusts in this State. In addition, the court provided that any interest accumulations from each child's beneficiary fund may be expended for their educational and medical or dental needs at the discretion of the trustee. ·Annot., 56 A.L.R.2d 1207; 27B C.J.S. Divorce § 319(5).

In *Cosgriff v. Cosgriff,* 126 N.W.2d 131 (N.D.1964), this court approved the continuation of lump-sum support payments until the youngest child attained his majority even though the older child or children had attained majority. This provision in *Cosgriff* in the decree was subject to modification by the court. In the case at bar, the trust, of course, is subject to the supervision of the court. We conclude that the court did not erroneously interpret §§ 14–05–24 or 14–05–25, N.D.C.C., when it created a trust for the education of the four minor children (which would include a college education). In the case at bar the trial court found that the four minor children shall receive the sum of $10,000.00 each to be held in trust for their respective educational benefit. There has been a trend toward awarding moneys for the furthering of education for children, including a college education, by the courts of the various States, even though the parents are divorced. The courts have expressly recognized that it is a duty of a divorced parent to provide a child not only with an elementary and secondary education, but a college education as well. This determination is based upon factors which include the financial condition of a parent, as well as the family mode of living prior to the divorce. A review of the record reveals that Lyle, while having a limited income for a period of five years commencing on September 1, 1977, (while the SBA loan is being paid at the rate of $5,700.00 per month), will be relieved of the SBA obligation long prior to the time when the oldest child, Rachel Ann, born March 4, 1970, graduates from high school, and that the payment of the moneys for the deferred property settlement and support moneys (which is to be paid in monthly installments of $2,161.39, including interest) will commence on October 1, 1982).

We determine that the finding was not a clearly erroneous interpretation of §§ 14–05–24 or 14–05–25, N.D.C.C. 24 Am.Jur.2d Divorce and Separation § 843; Annot., 56 A.L.R.2d 1207; 27B C.J.S. Divorce § 319(5). We adopt the rationale in those cases in Annot., 56 A.L.R.2d 1207 which affirm the court's provision for a college education. We are not unaware of the increasing necessity of a college education or its equivalent, as well as the tremendous escalation of the costs of securing such an education.

We hold that the court did not improperly construe §§ 14–05–24 or 14–05–25, N.D.C.C., in creating a provision in the trust for the education of the children of the parties.

However, the trial court added a further provision in the creation of a trust, which states in pertinent part:

> "Said separate trusts shall terminate and the remainder paid over to the respective beneficiary when he or she shall reach the age of twenty-two."

The general rule of law is that a divorce court cannot award any part of a father's property to his children. He is obligated to support his children but not to settle an estate upon them. 24 Am.Jur.2d, Divorce and Separation § 837; 27B C.J.S. Divorce § 291(1). Likewise, § 14–05–24, N.D.C.C., does not grant any authority to create a trust whereby the children of divorced parties receive certain property upon attaining their majority. There is no such legal burden placed upon non-divorced parents. *Williams v. Williams,* 428 P.2d 218 (Okl. 1967); *Johnson v. Johnson,* 169 N.W. 595 (Minn.1969); *Feldmann v. Feldmann,* 166 Kan. 699, 204 P.2d 742 (1949); *Farley v. Farley,* 227 Cal.App.2d 1, 38 Cal.Rptr. 357, *cert. den.* 379 U.S. 945, 85 S.Ct. 438, 13 L.Ed.2d 543 (1964). In reviewing the record in the instant case, we hold that the court should delete the reference to an award of a.lump sum to each of the four minor children upon each attaining the age of twenty-two years. Further consideration of the property division indicates to us

that it is within the trial court's equitable power to provide that any sums remaining, if any, in the corpus of the trust at the time that the children attain the age of twenty-two years be awarded to Paula. We so direct.

The district court awarded Paula the sum of $2,853.70 for attorney fees for the motion and trial in the district court. Lyle asserts that the district court's award of attorney fees is unreasonable and thus constitutes an abuse of discretion. He further urges that the district court's specific award in the property division of $40,000.00 will place Paula in a better position to pay her attorney fees from her own resources. Lyle's contention is unpersuasive. This court, in *Fischer v. Fischer,* 139 N.W.2d 845 (N.D.1966), in construing § 14–05–23, N.D.C.C., held that suit money is in the discretion of the trial court and its decision will not be interfered with unless it is shown that there has been an abuse of discretion. Abuse of discretion is never assumed but must be affirmatively established. *Fischer, supra; Bryant v. Bryant,* 102 N.W.2d 800 (N.D.1960). Likewise, in *Fischer, supra,* the determination of the attorney fees to be awarded to a party is determined by the party's financial condition at the time of the commencement of the action, and not as of the time of the appeal. Otherwise, a person with only potential assets might be denied representation at the most crucial stage of the lawsuit. A review of the record reveals that Lyle has failed to prove that Paula had sufficient resources to prosecute the suit and support herself at the time of the commencement of the suit, and that suit money was necessary in order for Paula to contest the action. Thus Lyle has failed to show that the trial court has abused its discretion. We adopt the rationale of *Fischer* and *Bryant, supra,* and conclude that it was not error for the court to award Paula $2,853.70 for attorney fees. Paula has also requested that this court approve the payment of attorney fees in the sum of $1,590.00 for attorney fees as a result of this appeal. While an application for approval of attorney fees on appeal was submitted to the district court, the district court has not acted upon the petition for payment of the attorney fees on appeal. While this court has concurrent jurisdiction in awarding attorney fees, we believe that the trial court should determine the amount of attorney fees where a petition is pending before it and that this court should not interfere with the ordinary processes of justice in the district court. Since the case will be remanded for other reasons, the trial court may determine the attorney fees at the same time.

Lyle has also appealed from the order denying the motion for a new trial. The motion was made on the ground of newly discovered evidence, consisting of a financial statement of Davis Jewelry, Inc. for the ten months ending October 31, 1977, and a floor plan of a shopping center under construction in the City of Grand Forks. The motion was not supported by affidavits of any kind. The court found that Lyle had not exercised reasonable diligence and found that no evidence was presented to the court as to the date the shopping center floor plan became available to Lyle. In addition, all of the records of Davis Jewelry, Inc. were available to Lyle and such records could have been produced at the trial. Furthermore, the issue as to the shopping center was raised in the main trial. The motion for a new trial on the ground of newly discovered evidence is addressed to the sound judicial discretion of the trial court and the appellate court will not interfere except in the case of an abuse of discretion. The record discloses no abuse of discretion on the part of the trial court in denying the motion for a new trial on the ground of newly discovered evidence. *Woodland v. Woodland,* 147 N.W.2d 590 (N.D.1966); Wright & Miller, Federal Practice and Procedure: Civil § 2808. We find no abuse of discretion in the denial of the motion for a new trial.

The decree as it relates to the property award of a lump sum to each of the children upon attaining the age of twenty-two years is reversed, the decree as it relates to alimony is modified, and the case is re-

manded with directions to proceed in conformity with this opinion.

ERICKSTAD, C. J., and SAND, J., concur.

PEDERSON, Justice, concurring in part and dissenting in part.

I concur in those parts of the majority opinion which affirm the actions of the trial court. I would affirm all of the judgment. Although property division and alimony bear the label "conclusions of law," they should be treated as "findings of fact." See *Schumacher v. Schumacher*, 242 N.W.2d 136, 139 (N.D.1976). We are not bound by the labels attached. *Bottineau Public Sch. Dist. # 1 v. Currie*, 259 N.W.2d 650, 653 (N.D.1977). Although the majority opinion treats division of property and alimony as findings of fact, it makes a de novo review of alimony in order to establish that Paula should receive $1,200 instead of $1,600 per month. I am not left with a definite and firm conviction that the award of $1,600 per month alimony was a mistake. See *In re Estate of Elmer*, 210 N.W.2d 815, 820 (N.D. 1973).

Except for his comments on the consideration of "fault," I agree with Justice Vogel's concurrence and dissent.

VOGEL, Justice, concurring in part and dissenting in part.

I agree with much of the majority opinion, but I cannot agree with that part of the opinion which reduces the alimony award to the wife.

I would uphold the trial court's determination as to alimony for several reasons.

1. I believe the disposition made by the trial court is fair and equitable in view of all of the circumstances. The trial court took into account, as the majority opinion does not, the fact that the husband's income for the next five years, as limited by his voluntary agreement to the terms of an S.B.A. loan, is an artificial and unrealistic figure. The majority opinion bases its conclusion upon that artificial and unrealistic figure, made up of $25,000 salary and $24,- 000 rental. But the fact is that average profits in the past and prospective profits in the future are much higher, and the excess will be accumulating during the period of artificial restriction of Lyle's income. Since he is the owner of the corporation, he will reap the benefit of the increase. To base alimony computations upon such artificial figures is unrealistic.

We held in *Schnell v. Schnell*, 252 N.W.2d 14 (N.D.1977), that a drop in a divorced spouse's income, which can be varied from year to year by management decisions, was no reason to reduce alimony or child support. In the present case the drop is due to a heavy loan-repayment schedule for five years and an agreement to limit salary during that time. It is, in my view, no reason to deprive the wife or children of their rights.

Even if Lyle had to dip into his net worth in order to make some of his payments for the five years when his income is limited, he would suffer no hardship. His net worth is about a quarter of a million dollars.

To compare his situation with that of the husband in *Hoster v. Hoster*, 216 N.W.2d 698 (N.D.1974), and *Larson v. Larson*, 234 N.W.2d 861 (N.D.1975), is impossible. Hoster had a negative or deficit income, after paying the alimony and child support he was required to pay, and had nothing left to live on. Larson, after paying his own living expenses and alimony and support obligations, was losing $97.96 per month. By no stretch of the imagination can these fact situations be compared to that of Lyle Davis.

2. A decent respect for Rule 52(a), North Dakota Rules of Civil Procedure, requires a determination that the decision of the district court was not clearly erroneous, if erroneous at all.

3. If it were true that Paula is receiving more than she is entitled to, the majority of this court should follow its own often-stated policy of considering fault in awarding alimony and making property divisions. The excess should be attributed to punishment of the wrongdoer. The divorce in this case

is granted on a fault ground, adultery, and the innocent party is Paula. In accordance with the majority's frequently expressed policy of punishing fault, the conduct of the parties should be considered in awarding alimony and property division.

I happen to disagree with the policy of considering fault in divorce cases, but I suggest that the majority should be consistent in applying its own rule.*

### CONCLUSION

I would affirm the district court's judgment in all particulars, except that I would remand the case to the district court to modify the provision as to the remaining corpus, if any, of the trust, at the termination of the trust, as provided in the majority opinion. In all other respects, including the award of alimony, I would affirm the judgment of the trial court.

---

* For recent expressions of the majority's views and mine, see *Nastrom v. Nastrom*, 262 N.W.2d 487 (N.D.1978), and *Haugeberg v. Haugeberg*, 258 N.W.2d 657 (N.D.1977).